**In re J.L.**

[Cite as *In re J.L.*, 176 Ohio App.3d 186, 2008-Ohio-1488.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–07–65.

Decided March 31, 2008.

F. Stephen Chamberlain, for appellant.

Mariah M. Cunningham, Assistant Prosecuting Attorney, for appellee.

Preston, Judge.

## I. Facts and Procedural Posture

{¶ 1} Appellant, Edcota Skinner, appeals the judgment of the Allen County Court of Common Pleas, Juvenile Division, granting permanent custody of her son, J.L. (d.o.b. 8/27/05) to appellee, Allen County Child Services Board ("ACCSB"). For reasons that follow, we reverse.

{¶ 2} On February 16, 2005, Skinner began her day reporting to work around 9:00 a.m. at a local Goodwill store. Around 2:00 p.m. she took her break for the day, returning home to check on her children, who were being watched by Tim Rowan, her boyfriend at the time.[1] According to Skinner, everything seemed fine; the children were playing—it was just another typical day.

---

1. Skinner and Rowan were married in May 2005. J.L.'s natural father died on April 9, 2003 and is not a party to this case. J.L. has two siblings, who are not parties to this case. Rowan has two daughters from a previous relationship, also not parties to this case.

{¶ 3} Skinner returned to her job at Goodwill. Around 3:00 p.m., she received a phone call from Rowan informing her that her 17–month–old son J.L. burned his feet in a bucket of hot water. Rowan told Skinner that after J.L. was burned, he took him into the bathroom and soaked his feet in cold water. Rowan also indicated that he placed Vaseline and powder on J.L.'s feet. Rowan asked Skinner if he should take J.L. to the hospital. Skinner asked Rowan how badly the child was burned, and Rowan indicated that it was "like sun burn." Based on this information, Skinner told Rowan to wait until she got home from work in an hour or so and she would determine if a hospital visit was necessary. Around 4:00 or 5:00 p.m., Skinner returned home, observed that J.L.'s feet were "puffy," and determined that he needed medical attention.

{¶ 4} As a result of this incident, ACCSB was notified and began an investigation. On February 17, 2005, J.L. was taken into ACCSB's custody, and on February 18, a shelter-care hearing was held. The trial court then ordered that temporary care and custody remain with ACCSB. On February 22, 2005, the state filed a complaint alleging that J.L. was a dependent, neglected, and abused child.

{¶ 5} On April 29, 2005, the trial court determined that J.L.'s burns were not accidental. The trial court then rendered judgment finding that J.L. was an abused and neglected child. On May 17, 2005, the trial court determined that J.L. should be placed in ACCSB's temporary custody and adopted the case plan with minor amendments.

{¶ 6} On January 13, 2006, ACCSB moved the court for a modification of disposition asking that J.L. be returned to Skinner with protective supervision remaining with the agency. At the hearing, it was discovered that Skinner "usually" allowed Rowan to watch J.L. unsupervised, a violation of the case plan. As a result of this evidence, the trial court denied the motion and ordered that temporary custody remain with ACCSB.

{¶ 7} ACCSB filed a second motion to modify disposition on July 13, 2006 requesting that J.L. be returned to Skinner subject to protective supervision. In support of its motion, ACCSB attached a modified case plan, which provided:

> Allen County Children Services is asking for modification of disposition to that of protective supervision. Tim [Rowan] has successfully completed anger management classes through Lutheran Social Services. Edcota [Skinner] has adequate day care in place, and the residence is clean and suitable. Edcota has completed a parent education program as requested. The family is continuing to work with Help Me Grow.

The trial court, however, dismissed the motion pursuant to an agreement between the parties that temporary custody remain with the agency.

{¶ 8} Since Skinner was making progress under the case plan, J.L. was allowed to have extended visitation with Skinner and Rowan. However, on July 19, 2006, during an unannounced visit to Skinner's home, a caseworker noticed "bruises and lacerations" on the back of J.L.'s legs. When the caseworker asked Skinner about the marks and bruises, Skinner said that J.L. had fallen down outside while playing. When the caseworker expressed doubt, Skinner told the caseworker that the bruises were from the bumper cars at Cedar Point. ACCSB removed J.L. from the home later that day, and extended visitation was terminated.

{¶ 9} On July 21, 2006, the caseworker called Skinner to talk about the marks on J.L. During this phone conversation, Skinner admitted that the marks were the result of physical discipline after J.L. ran away at King's Island. Skinner told the caseworker that she "whooped [him] with a belt" and that this caused the bruises. However, Skinner denied that she had hit J.L. out of anger and insisted that it was for "punishment."

{¶ 10} On January 30, 2007, the agency filed a motion for permanent custody. On April 3 and 6, 2007, hearings on the motion were held. On August 30, 2007, the trial court awarded permanent custody to ACCSB. It is from this judgment that Skinner appeals, asserting four assignments of error for review.

## II. Constitutional Protections

{¶ 11} "Parents have a 'fundamental liberty interest' in the care, custody, and management of [their children]." *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, quoting *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599. The right to raise one's children is an "essential" and "basic civil right." Id., citing *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551; *Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042. A parent's right to manage the rearing of his or her children is among those inalienable rights secured by the natural law, which Section 1, Article I of the Ohio Constitution was intended to protect from infringement by the state. *State v. Thompson,* 2d Dist. No. 04CA30, 2006-Ohio-582, 2006 WL 307715, ¶ 30.

{¶ 12} "[P]arents have the right of restraint over their children and the duty of correcting and punishing them for misbehavior." *In re Schuerman* (1991), 74 Ohio App.3d 528, 531, 599 N.E.2d 728. Parents have the right to use reasonable physical discipline, or corporal punishment, to prevent and punish a child's misconduct. *State v. Hauenstein* (1997), 121 Ohio App.3d 511, 516, 700 N.E.2d 378, citing *State v. Suchomski* (1991), 58 Ohio St.3d 74, 75, 567 N.E.2d 1304; *Thompson,* 2006-Ohio-582, 2006 WL 307715, at ¶ 30; *Matter of Jandrew* (Dec. 29, 1997), 4th Dist. No. 97 CA 4, 1997 WL 802848, at *6; *In re K.B.,* 9th Dist. No. 21365, 2003-Ohio-3784, 2003 WL 21658319, ¶ 14, citing *In re Barrett*

(Mar. 13, 1998), 1st Dist. No. C–970196, 1998 WL 107660, at *4; *Doe v. Heck* (C.A.7, 2003), 327 F.3d 492, 523. The right of parents to administer reasonable corporal punishment is deeply rooted in the history and traditions of this nation. See *State v. Hoover* (1982), 5 Ohio App.3d 207, 211, 5 OBR 470, 450 N.E.2d 710, quoting *Quinn v. Nolan* (1879), 7 Dec.Rep. 585, 586, 1879 WL 6389 ("From the time of Solomon to the present, parents have had the right, in a proper manner and to a proper degree, of inflicting corporal punishment upon their children * * * "). See also 1 Blackstone, Commentaries, Rights of Persons, Chap. 16: of Parent and Child, Section 2 (observing that parents may correct an underage child in a reasonable manner under the common law).

## III. Standard of Review

{¶ 13} Pursuant to R.C. 2151.413, an agency that has been granted temporary custody of a child that has not been abandoned or orphaned may seek permanent custody of that child. R.C. 2151.414(B) permits permanent custody to be granted if the agency has shown by clear and convincing evidence that such action is in the "best interests of the child," and that any of the factors in division (B)(1) apply. *In re Jackson*, 3d Dist. No. 5–03–25, 2004-Ohio-542, 2004 WL 231513, ¶ 6.

{¶ 14} To determine whether granting permanent custody to the agency is in the "best interests of the child," R.C. 2151.414(D) provides a nonexclusive list of factors for the trial court to consider:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 15} "Clear and convincing evidence" is more than a mere preponderance of the evidence, but not of such certainty as is required by "beyond a reasonable doubt" as in a criminal case; rather, it is evidence that provides the trier of fact with a firm belief or conviction as to the facts sought to be

established. *In re Meyer* (1994), 98 Ohio App.3d 189, 195, 648 N.E.2d 52, citing *Cincinnati Bar Assn. v. Massengale* (1991), 58 Ohio St.3d 121, 122, 568 N.E.2d 1222. Upon review, an appellate court "must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." Id., citing *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 18 OBR 419, 481 N.E.2d 613. A reviewing court will reverse a trial court's determination if it is *not* supported by clear and convincing evidence. Id., citing *Holcomb*, 18 Ohio St.3d at 368, 18 OBR 419, 481 N.E.2d 613; *In re Adoption of Lay* (1986), 25 Ohio St.3d 41, 42, 25 OBR 66, 495 N.E.2d 9.

### IV. Trial Court's Judgment Entry

{¶ 16} The trial court granted ACCSB permanent custody of J.L. under two revised code subsections, R.C. 2151.414(B)(1)(d) and (B)(1)(a). In each case, the trial court applied the R.C. 2151.414(D)(1–5) factors to determine whether granting ACCSB permanent custody was in J.L.'s best interests. Applying subsection (B)(1)(d) and the (D)(1) through (5) factors, the trial court found:

> [T]he relationship and interaction with the mother is strained in that the mother focuses her attention on the other children as opposed to [J.L.] during visitation, appears to be cold and aloof toward [J.L.] contrary to her behavior toward her other children and it appears that the mother has not truly bonded with [J.L.]. [J.L.] appears to have a good relationship with and interacts well with the foster parents, who are providing for both his basic and special needs. The Guardian Ad Litem has opined that it would be in [J.L.'s] best interest that permanent custody be granted to Allen County Children Services Board * * * [J.L.] has been in Allen County Children Services Board custody for twenty-one of twenty-two consecutive months * * * The agency, on two occasions, made an effort to place the child with his mother, but such efforts were unsuccessful in that the mother on both occasions violated the terms or provisions of the case plan in that she permitted the child to be left unsupervised with Tim Rowan and she administered a form of unacceptable discipline. Although the agency has initiated interstate proceedings with the State of Oregon for a potential placement with a grandmother in that state, such proceedings have not been completed as of the time of the filing of the Motion for Permanent Custody and cannot be completed prior to the expiration of the time constraints on the agency having temporary custody of the child. There are no other relatives available for placement. The child's need of a legally secure permanent placement cannot be achieved without a grant of permanent custody to the agency.

Applying subsection (B)(1)(a) and the (D)(1) through (5) factors, the trial court found as to the mother:

[F]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the mother had failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. The child was removed from the home of the mother because of abuse caused by her then live-in boyfriend whom she subsequently married; the mother, contrary to the case plan requirements, permitted her husband to care for the child without adult supervision; and finally, the mother, herself, admitted to abusing the child by whipping him repeatedly with a belt. As described in Ohio Revised Code Section 2151.414(E), as to the mother, the mother has committed abuse against the child by repeatedly whipping the child with a belt causing severe bruising to his legs in July, 2006. As described in Ohio Revised Code Section 2151.414, the mother is unwilling to prevent the child from suffering further physical and/or emotional abuse in that she had permitted Tim Rowan to supervise the child without other adult supervision contrary to provisions of the case plan approved by this Court. The child cannot be placed with the mother or step-father within a reasonable time and should not be placed with either. There are no available suitable relatives with whom the child can be placed. The Guardian Ad Litem has recommended that the child be placed in the permanent custody of Allen County Children Services Board, as same would be in his best interest.

For all these reasons, the trial court concluded that granting ACCSB's motion for permanent custody was in J.L.'s best interests.

## V. Analysis

{¶ 17} With the applicable facts, constitutional protections, standard of review, and trial court ruling in view, we now address Skinner's assignments of error. We have elected to address the assignments of error out of the order they appear in Skinner's brief.

## Assignment of Error No. I

The trial court misconstrued the corporal punishment inflicted upon the child by the mother as abuse contrary to law.

{¶ 18} In her first assignment of error, Skinner alleges that the trial court misconstrued her use of corporal punishment as abuse contrary to law. The state argues that the trial court did not rely "excessively" on the fact that Skinner administered what it concluded was "unacceptable discipline" in granting ACCSB's motion for permanent custody. The record, however, indicates otherwise for three reasons: (1) the testimony and evidence at the permanent custody hearing, (2) the GAL report, and (3) the trial court's analysis. In addition, the

state also emphasizes Skinner's use of corporal punishment in its brief to this court.

## A. Trial Court's Reliance upon "Unacceptable" Discipline

### 1. Testimony and Evidence Presented

{¶ 19} The permanent-custody hearing testimony emphasized Skinner's use of "unacceptable discipline." Caseworkers Amber Martin and Darren Core both testified at length about the spanking incident at King's Island. Core testified that during his July 19, 2006 visit to the home he noticed "pretty severe bruises and lacerations to [J.L.'s] legs." Core also indicated that the family was "not to use physical discipline," though he could not recall if that requirement was part of the case plan. Core also testified that Skinner told him that she "whooped" J.L. for "punishment," not because she was angry or lost control.

{¶ 20} Likewise, Martin testified concerning the use of "unacceptable discipline." Martin testified that Rowan believed that time-outs fail to teach children a lesson, and spanking was an acceptable form of discipline. Martin testified that she shared her concerns about spanking with Skinner after the July 2006 incident. Martin also testified that Skinner spanked J.L. around March 16, 2007, but she did not observe any marks or bruising on J.L. after the spanking. When Martin was asked if she would recommend placing J.L. back in the home, she stated that "at this time I would not recommend placing him in the home * * * [b]ecause as [Skinner] said, she is still * * * resorting to spanking [J.L.] at this time." When asked, again, what her concern was with placing J.L. in the home, Martin stated: "Like I said, just resorting to physical violence." On cross-examination, Martin explained that when she used the term "physical violence," she meant "physical punishment" or "spanking." Martin, again, emphasized her concern about corporal punishment, stating that "[m]y concerns are the continued use of corporal punishment, and physical punishment, and with us still being present, and that continuing."

{¶ 21} The state also elicited testimony concerning the use of corporal punishment from Stephanie Dubuque, J.L.'s foster mother, and Judy Schaffer, a licensed social worker at the Family Resource Center in Lima, Ohio. Dubuque testified that she implements time-outs to discipline J.L. She further testified that J.L. is "scared" when she disciplines him and asks her and her husband not to hit him. When J.L. is put in time-out, however, he will "start to cry and scream at the top of his lungs." Dubuque testified that she works with J.L. to calm him down and control his anger using techniques learned from Schaffer. She further testified concerning the March 16 spanking: "[J.L.] told me that he was mad at me because his mom hit him, spanked him. * * * Because I told him that nobody is supposed to spank him." On cross-examination, Dubuque clarified the

March 16 spanking incident. Dubuque testified that J.L. told her his mom hit him on the "bottom" with her hand. Dubuque examined J.L. but found no marks.

{¶ 22} Schaffer also testified at length about the concerns with corporal punishment she shared with Skinner:

Q: What types of things did you tell [Skinner] about discipline?

A: We talked extensively about what research shows to be effective discipline. So we talked in terms of wanting to spend most of our time having a really positive relationship and really praising desired behavior. When misbehaviors do arise, we talked about such techniques as planned ignoring for misbehaviors that are smaller and not dangerous. The effective use of time out. We talked about, specifically, not using spanking at this point because of the way [J.L.] seemed so traumatized initially. When he first came to me, I really diagnosed the child with Post Traumatic Stress Disorder because he was having nightmares. He was crying out. He was afraid and exhibiting some of those things that were connected to what had been described to me as physical punishment. So we did talk about not spanking and how we could substitute other things instead that were much more affective. Basically, I teach parents that I work with that spanking has minimal effectiveness on a very short term basis and that positive guidance * * * teaching children that we want them to do is a much more affective way to get kids on board with us. Developmentally, young children only understand that spanking means it's okay to hurt others. Developmentally, that's what they know. Our intention is to guide them and teach them, but that's never the message that they get when they're this young. So that's a hard thing because folks spank their children. I don't feel it's effective.

When asked what her concern was with J.L. being in the home, Schaffer stated: "I am concerned that [J.L.] will be spanked in that home." On cross-examination, Schaffer further explained her concerns with spanking: "What I shared with [Skinner] is that * * * and I have no way to test this out. This could be a child, if he's continued to be hit, that he will be a child that ends up in the court system when he's 14, 15, 16 years old, and he won't have good coping mechanisms at that point." On redirect examination, Schaffer continued to express her concerns about spanking:

What I feel about spanking is that it is among the least effective ways to get children to comply with us. Okay? It's the least effective way to manage misbehavior in children. It makes them angrier. It makes them resentful, and it only works on a very short term basis. It does not teach children what to do, so it's only abusive. I'm a social worker. It's abusive if it's leaving

marks or if it's over the edge, you know; but no, folks spank their kids. They get to choose to do that for the most part.

{¶ 23} Skinner testified at length about her use of corporal punishment. She testified that she did not spank J.L. often and did not begin spanking him until after they moved from Oregon. Skinner testified that J.L. "has problems with calming himself down when he's upset. When [he] get's upset, he likes to scream at the top of his lungs. You can hold him to try to calm him down. It just makes it worse. * * * If you ignore him, he gets worse." Skinner attempted to resolve these outbursts by asking J.L., "Are you ready to calm down? Are you ready to calm down?"

{¶ 24} Skinner admitted she "did spank [J.L.] at King's Island with the belt." However, she did not observe bruises after the spanking. Skinner testified that she spanked J.L. because "we were in the water park area and he ran off and no one knew where he was at. Security brought him back * * *." Skinner testified that she was not "trying to be out of control," but was spanking J.L. for discipline purposes. Skinner testified that the marks on J.L.'s legs occurred because J.L. moved when she was disciplining him, which caused her to miss J.L.'s butt. According to Skinner, she was never told not to spank J.L. until she enrolled in the parenting classes with Schaffer. Skinner testified concerning her use of the discipline techniques taught by Schaffer, but insisted that she did not have very many opportunities to use the new techniques because J.L. was in a foster home.

{¶ 25} In addition to the testimony, the state presented pictures of J.L. following the spanking incident at Kings Island depicting the bruises or red marks on his buttocks, thigh, and lower right calf.

{¶ 26} Having reviewed the entire transcripts and the evidence presented, we cannot but conclude that the majority of the permanent-custody hearing focused on Skinner's use of "unacceptable discipline."

2. GAL Report

{¶ 27} The GAL report also addressed concerns about Skinner's use of corporal punishment. The GAL reported that in July 2006, during an extended visitation (family trip to King's Island), Skinner "took [J.L.] into a bathroom stall and beat him with a belt, with sufficient force to leave bruises on his body." The report then classified this as "abuse." The report continued:

Ms. Schaffer indicated to me that [Skinner] has worked very hard on the positive parenting lessons Ms. Schaffer assigned, and that [Skinner's] interactions with [J.L.] have improved somewhat as a result. However, Ms. Schaffer stressed that she feels very strongly that physical punishment, including spanking, is counter productive with a child such as [J.L.]. His angry

personality and his post-traumatic stress combine to make him 'hyper-sensitive' to physical punishment, and that continued abuse and/or spanking will almost certainly create a situation in which his behavior will degenerate. Furthermore, during the counseling sessions, [Rowan] (now [Skinner's] husband) told Ms. Schaffer that he believes spanking is an effective form of discipline for a child, and [Skinner] admitted to me that she has spanked [J.L.] despite Ms. Schaffer's strong recommendation against it. * * * [J.L.'s] behavior after an incident of physical punishment seems to bear out Judy Schaffer's predictions that continued spanking and physical discipline at the hands of [Rowan] and [Skinner] will continue to create a very disturbed, angry teenager, with the potential for violence in the future. * * * [Rowan] has apparently made no concessions to the idea that physical punishment is a harmful form of discipline in J.L.'s case.

(Id.). Thus, the GAL report also emphasized Skinner's use of "unacceptable discipline."

### 3. Trial Court's Analysis

{¶ 28} In addition to the fact that the hearing testimony, the state's evidence, and the GAL report emphasized Skinner's use of "unacceptable discipline," the trial court ruling also emphasized this factor. The trial court throughout its opinion used the term "whipping" to describe Skinner's method of corporal punishment. Skinner did not use this term, nor did any of those testifying before the trial court. Skinner testified that she "spanked" J.L. with a belt; Core testified that Skinner told him she "whooped [J.L.] with a belt"; Dubuque, Schaffer, and Martin referred to Skinner's discipline as "spanking." The trial court's characterization of Skinner's form of discipline as "whipping" apparently led it to conclude that she "administered a form of unacceptable discipline."

{¶ 29} The trial court also continued its analysis beyond what was necessary to find that Skinner's corporal punishment constituted "abuse," citing R.C. 2151.414(E)(3). The fact that the trial court made this finding when it was not required to indicates that Skinner's use of corporal punishment was important to the trial court.

{¶ 30} Furthermore, the state's argument that Skinner's use of corporal punishment was not an important factor is suspect because the state emphasizes this issue five times in its brief to this court. The state argues that Skinner (1) "consciously chose to spank this emotionally fragile, abused child," (2) has failed to "recognize that physical discipline is extremely detrimental to [J.L.]," (3) "refused to stop hitting [J.L.] despite the opinions and training of professionals being impressed upon her," (4) "beat [J.L.] with a belt," and (5) "continued to use

physical discipline against [J.L.]." Therefore, the state's argument that the corporal punishment was not an important factor appears questionable at best.

{¶ 31} For all these reasons, we find that the state's argument that the trial court did not "excessively" rely upon Skinner's use of corporal punishment in granting permanent custody to ACCSB lacks merit. It may be true that the trial court did not rely *exclusively* upon Skinner's use of corporal punishment, but it is clear from the record that it was an important factor in the trial court's determination.

## B. Trial Court's "Abuse" Finding

{¶ 32} After reviewing the evidence presented at the permanent-custody hearing, the trial court concluded that "the mother has committed abuse against the child by repeatedly whipping the child with a belt causing severe bruising to his legs in July 2006." We disagree with the trial court's legal conclusion that the incident of corporal punishment constituted "abuse" as that term is defined in the Ohio Revised Code.

{¶ 33} Since statutory interpretation is a question of law, our review is de novo. *State v. Consilio,* 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.2d 1167, ¶ 8. De novo review is independent and without deference to the trial court's judgment. *Wilson v. AC & S, Inc.,* 169 Ohio App.3d 720, 2006-Ohio-6704, 864 N.E.2d 682, ¶ 61.

{¶ 34} R.C. 2151.414(E)(3) provides that the trial court may consider the fact that "[t]he parent committed any abuse described in section 2151.031 of the Revised Code* * *." R.C. 2151.031(C) provides that an "abused" child is any child who "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it. Except as provided in division (D) of this section, *a child exhibiting evidence of corporal punishment or other physical disciplinary measure by a parent, guardian, custodian, person having custody or control, or person in loco parentis of a child is not an abused child under this division if the measure is not prohibited under section 2919.22 of the Revised Code."* (Emphasis added.) R.C. 2919.22(B)(3) provides that "[n]o person shall do any of the following to a child under eighteen years of age": "Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is *excessive under the circumstances and* creates a *substantial risk of serious physical harm to the child."* (Emphasis added.)

{¶ 35} Whether corporal punishment or physical discipline is excessive is determined in light of the totality of the circumstances. *State v. Hart* (1996), 110

Ohio App.3d 250, 255–256, 673 N.E.2d 992. In analyzing the totality of the circumstances, a court looks at several factors, including (1) the child's age, (2) the behavior being disciplined, (3) the child's response to correction, (4) the location and severity of the punishment, and (5) the parent's state of mind while administering the punishment. Id.; *State v. Jones* (2000), 140 Ohio App.3d 422, 430, 747 N.E.2d 891. " 'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). " 'Serious physical harm to persons' means any of the following":

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

1. Trial Court's Failure to Apply a Proper Legal Analysis

{¶ 36} The trial court's conclusion that the corporal punishment in this case was "abuse" suffers from three fatal flaws. First, the trial court failed to analyze any of the above statutes or factors when rendering its determination. To support a finding that a child is an "abused" child under R.C. 2151.031(C) on the basis of corporal punishment, the court must determine that the punishment is in violation of R.C. 2919.22(B)(3). See *In re Schuerman*, 74 Ohio App.3d at 531–532, 599 N.E.2d 728; *Matter of Rogers* (Aug. 24, 1989), 3d Dist. No. 12–89–5, 1989 WL 98423; *In re Miles*, 9th Dist. No. 01CA0054, 2002-Ohio-2438, 2002 WL 1065704, ¶ 10, citing *State v. Burdine–Justice* (1998), 125 Ohio App.3d 707, 714, 709 N.E.2d 551; *State v. Ivey* (1994), 98 Ohio App.3d 249, 257, 648 N.E.2d 519. *State v. Brunner* (Apr. 15, 1985), 12th Dist. No. CA84–08–100, 1985 WL 8658, at *2, 5. This inquiry is necessary to protect and balance the competing interests involved in these cases—the parents' fundamental, inalienable right to raise and control their children and the state's legitimate interest in the protection and safety of children and in the reporting of child abuse. *In re Horton*, 9th Dist. No. 03AP–1181, 2004-Ohio-6249, 2004 WL 2674562, ¶ 13–14, citing *State v. Hause* (Aug. 6, 1999), 2d Dist. No. 17614, 1999 WL 959184, at *6–7; *Kramer*, 455 U.S. at 753, 102 S.Ct. 1388, 71 L.Ed.2d 599. To constitute a violation of R.C.

2919.22(B)(3), the court must find that the punishment is (1) excessive under the circumstances and (2) creates a substantial risk of serious physical harm. *Brunner*, 12th Dist. No. CA84–08–100, at *5, 1985 WL 8658.

{¶ 37} The trial court in this case simply states that "the mother has committed abuse against the child by repeatedly whipping the child with a belt causing severe bruising to his legs * * *." The trial court was correct to analyze the location and severity of the physical punishment, but this is only one factor that the court must consider when determining if the punishment was excessive under the circumstances. *Hart*, 110 Ohio App.3d at 255–256, 673 N.E.2d 992; *Jones*, 140 Ohio App.3d at 430, 747 N.E.2d 891. Furthermore, the trial court failed to analyze whether the punishment created a substantial risk of serious physical harm. Consequently, the trial court's conclusion was not supported by a proper legal analysis.

## 2. Trial Court Erred As a Matter of Law

{¶ 38} Second, the trial court's conclusion that J.L. was an abused child because of Skinner's use of corporal punishment is incorrect as a matter of law. At the time of the corporal punishment, J.L. was 35 months old. Since J.L. was almost three years of age, we think this factor weighs in favor of finding the use of corporal punishment reasonable.

{¶ 39} J.L. was disciplined after running away from his family at King's Island, and a security guard returned him to his mother. This misbehavior merited some level of discipline. As to how J.L. responded to being physically disciplined this particular time, the record is unclear. There are only two incidents of corporal punishment in the record, the July 15–16 King's Island incident and the March 16, 2007 visitation incident. As to the latter, Skinner testified that J.L. was not angry or resentful and that he went outside and played afterwards. The record, on the other hand, indicates that J.L.'s response to time-outs was mixed.

{¶ 40} The location and severity of the punishment during the King's Island visit are more apparent from the record. Caseworker Core testified that he observed "pretty severe bruises and lacerations to [J.L.'s] legs." The state submitted photographic evidence into the record showing the bruises as well. The photographs depict red marks mostly on the back of J.L.'s buttocks and thighs, with one mark appearing on his right calf. It appears that the red mark on the right thigh had a slight cut as well, which was scabbed and healing. The marks were approximately three to four days old and appear to be fading.

{¶ 41} While we certainly share the trial court's sentiment that striking a child with a belt on back of the legs supports a finding that the punishment was excessive, this court has stated that corporal punishment on parts of the body other than the buttocks may be proper and reasonable. *Hart*, 110 Ohio App.3d

at 255, 673 N.E.2d 992. In addition, Skinner testified that she had intended to strike J.L. on the butt; however, J.L. moved, which is why she missed. As to the severity, the marks were red but also appeared to be fading and healing within three to four days after the incident, which indicates that the discipline may not have been excessive. Skinner also testified that she did not observe bruises on J.L. after the incident. The record lacks any medical evidence, which would lead one to conclude that the discipline was excessive. No physician testified at the hearing, nor was any medical report admitted into evidence showing that J.L. required medical attention as a result of the discipline. In fact, on the day the caseworker discovered the bruises, J.L. was outside playing with his brother.

{¶ 42} Finally, we must consider the fact that Skinner testified that she administered corporal punishment for "discipline" and not because she was upset or angry. Skinner also testified that she does not spank J.L. frequently. In fact, there are only two incidents of corporal punishment in the record.

{¶ 43} Viewing all these circumstances, we cannot conclude that the spanking (or "whooping") incident at King's Island was excessive. Although we are concerned by the location of the marks on J.L., we cannot say, as a matter of law, that the punishment was excessive when viewed in the totality of the circumstances.

{¶ 44} We also cannot conclude that the punishment created a substantial risk of serious physical harm as those terms are defined. The evidence presented consisted of Core's testimony and the photographs, which, for the most part, revealed that J.L. was bruised. Our review of the admitted photographic evidence confirms that J.L. was bruised, but bruising alone is not sufficient to constitute serious physical harm. In re Schuerman, 74 Ohio App.3d at 532, 599 N.E.2d 728 (trial court could reasonably infer that severe bruising on the buttocks, thighs, and ankles from punishment that was inflicted multiple times for the same misbehavior with a wooden paddle or belt on an eight-year-old girl created a substantial risk of serious physical harm). Other courts have found that punishment much more severe than J.L.'s did not constitute serious physical harm. See, e.g., Ivey, 98 Ohio App.3d at 255–256, 648 N.E.2d 519 (bruised left eyelid, bruises, welts, and lacerations caused by a belt whipping on the buttocks and lower legs and a swollen hand was not "serious physical harm"). Again, notably missing from the record is any medical evidence or reports to show that J.L.'s injuries amounted to serious physical harm. On the basis of this record, we cannot conclude that the corporal punishment caused a substantial risk of serious physical harm.

{¶ 45} Since the corporal punishment inflicted was not excessive under the circumstances and did not create a substantial risk of serious physical harm, Skinner did not violate R.C. 2919.22(B)(3). Therefore, J.L. is not an "abused"

child under R.C. 2151.031(C) because of the corporal punishment, and the trial court erred as a matter of law to so conclude.

### 3. Trial Court's Use of the Corporal Punishment Incident Was Unjust

{¶ 46} Third, the trial court's reliance upon the July 2006 corporal punishment incident is also unjust. To begin with, not one of the case plans instructed Skinner to refrain from corporal punishment. According to the record, Skinner was first advised to refrain from corporal punishment by Judy Schaffer *after* the July 2006 incident. The only incident that occurred following Schaffer's recommendation was on March 16, 2007 when Skinner spanked J.L. on the butt twice with her bare hand, through his pants.

{¶ 47} Skinner also testified that she was implementing Schaffer's recommended discipline techniques and that she was willing to stop using corporal punishment if that was necessary to keep her son. Skinner's testimony is confirmed by Schaffer's January 11, 2007 progress report. The record also shows that Skinner completed an anger-management program following the incident. By all accounts, Skinner was making progress and substantially complying with the case plans and Schaffer's recommendations.

{¶ 48} For all these reasons, Skinner's first assignment of error is sustained.

### Assignment of Error No. III

The trial court failed to make findings consistent with the standard of clear and convincing evidence.

{¶ 49} In her third assignment of error, Skinner argues that the evidence presented did not clearly and convincingly establish that granting ACCSB's motion for permanent custody was in J.L.'s best interests. Specifically, Skinner argues that the trial court granted ACCSB's motion based upon minor case-plan violations. The state argues that the evidence presented in this case meets the clear-and-convincing evidence standard. We disagree with the state.

{¶ 50} Since we have determined that the trial court erred in concluding that the July 2006 corporal punishment incident was "abuse," the trial court could not rely upon this fact to support its determination that granting ACCSB permanent custody was in J.L.'s best interests. Therefore, we must determine whether the trial court's alternative grounds are sufficient to clearly and convincingly find that granting permanent custody to ACCSB was in J.L.'s best interests. We find the alternative grounds fail to meet this standard as well.

{¶ 51} In addition to its abuse conclusion, the trial court relied upon four other factors to find that granting permanent custody to ACCSB was in J.L.'s best interests. First, the trial court noted that the relationship between Skinner

and J.L. was "cold and aloof," but that the relationship between the foster parents and J.L. was "good." This factual finding is based upon the GAL report. The trial court could consider this factor; however, the fact that the child has a better relationship with his foster parents is not, by itself, a reason to terminate the parental rights of the natural parent. See *In re Alexis K.*, 160 Ohio App.3d 32, 2005-Ohio-1380, 825 N.E.2d 1148, ¶ 22, citing *In re Lay* (1987), 43 Ohio App.3d 78, 82, 539 N.E.2d 664. It is "[o]nly where there is a 'demonstrated incapacity or something akin to criminal neglect that the law is justified in interfering with the natural relations of parent and child.'" Id., quoting *In re Konneker* (1929), 30 Ohio App. 502, 511, 165 N.E. 850. Furthermore, the trial court failed to address the importance of J.L.'s relationship with his siblings. The record indicates that J.L. had a close relationship with his siblings, and Skinner has custody of them.

{¶ 52} Second, the trial court relied upon the GAL report and recommendation. The GAL opined that it would be in J.L.'s best interests that ACCSB be granted permanent custody. However, the GAL report also confirmed that J.L. wanted to return home and has a strong bond with his siblings. When asked where he wanted to live, J.L. responded, "[w]ith my mommy, because I miss my brother. That's where he lives." The GAL's analysis of this statement, though, appears dismissive:

[J.L.] is a surprisingly articulate three-year old, but he is of course too young to fully understand what is happening in his life at this time, and his behavior after an incident of physical punishment seems to bear out Judy Schaffer's predictions that continued spanking and physical discipline at the hands of [Rowan] and [Skinner] will continue to create a very disturbed, angry, teenager with the potential for violence in the future.

In addition to the GAL report indicating that J.L. desired to live at home, Skinner testified that J.L. told her that he wanted to come home.

{¶ 53} Third, the trial court relied upon the fact that J.L. has been in ACCSB's temporary custody for 21 of 22 consecutive months. This factor weighs in ACCSB's favor.

{¶ 54} Fourth, the trial court relied upon the fact that Skinner allowed J.L. to be left with Rowan unsupervised. This case-plan violation was discovered during the January 13, 2006 hearing to modify disposition. However, the trial court's reliance upon this violation is problematic. On July 13, 2006, the state filed a second motion to modify disposition asking the court to transfer custody of J.L. to Skinner with protective supervision remaining with ACCSB. The state cited several reasons for the change of disposition, including the fact that Skinner had secured appropriate day care for J.L. Consequently, the violation—Rowan watching J.L. unsupervised—was remedied by Skinner and was no longer an issue at

the time of the permanent-custody hearing. Therefore, we cannot find that this factor supports granting permanent custody to ACCSB.

{¶ 55} On the other hand, the record contains evidence that Skinner was cooperating with ACCSB; attended most, if not all, of her parenting classes; initiated and successfully completed anger-management training; arranged for alternative day care as required; and began to implement the discipline techniques she learned from Schaffer. The record also indicates that Skinner was willing to modify her behaviors and do whatever was necessary to keep her son. Skinner implored the trial court at length: "I don't want [J.L.] to go live with some people that we don't even know. I don't want to take him away from his brothers and sisters and away from us. I try very hard to raise my kids and still go to school. Being only 21 years old, I've tried real hard to take care of my kids. I don't think it's fair to come down here and get them taken away from me and I've had no peace because since I've been here, I've had to deal with Children's Services. I'm just now starting to get things back together with my son, Amari, and now I have to sit here and go through this, and they're trying to take my other son away from me forever. I don't care what they say. I'm not perfect. I didn't say that, but I try really, really hard to be there for them and make them happy. I made a mistake. I paid for it every day that they're sitting there in a foster home with some people that he shouldn't be with. I'm sorry for that, but I can't take it back because it already happened. I don't want them to be taken away from me. I don't think I deserve it. * * * I'll do what I have to do to keep them from being back in Children Services, keep them from being hurt. Whatever I have to do. * * * If I don't spank [J.L.] to get him back, I won't spank him, but I just want my kids back, my child. I want him to be with us."

{¶ 56} Finally, the record indicates that Skinner was not given sufficient time to implement the new discipline techniques she learned from Schaffer. Schaffer and Martin admitted that Skinner needed more time to implement these methods, and Martin claimed that ACCSB was simply out of time by statute.

{¶ 57} Skinner has certainly failed at times, but overall the record shows a frustrated but cooperative mother who strongly desires to raise her son. Reviewing the entire record in this case, we cannot conclude that the trial court's decision to grant permanent custody to ACCSB was supported by clear and convincing evidence as required.

{¶ 58} Skinner's third assignment of error is, therefore, sustained.

## Assignment of Error No. II

That counsel for the mother was ineffective thereby rendering the result of the permanent custody hearing in doubt as to its reliability and in violation of the mother's constitutional and statutory rights.

## Assignment of Error No. IV

The finding of permanent custody is against the manifest weight of the evidence.

{¶ 59} Since we have sustained Skinner's first and second assignments of error, Skinner's remaining assignments of error are now moot.

## VI. Conclusion

{¶ 60} Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

WILLAMOWSKI and ROGERS, JJ., concur.