[Cite as *In re S.S.*, 2013-Ohio-747.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

IN THE MATTER OF:

    S.S.,

DEPENDENT CHILD.

[JOANN B. PERSINGER –
    APPELLANT].

CASE NO.  8-12-06


O P I N I O N


IN THE MATTER OF:

    J.S.,

DEPENDENT CHILD.

[JOANN B. PERSINGER –
    APPELLANT].

CASE NO.  8-12-07


O P I N I O N


IN THE MATTER OF:

    K.P.,

DEPENDENT CHILD.

[JOANN B. PERSINGER –
    APPELLANT].

CASE NO.  8-12-08


O P I N I O N

**Appeals from Logan County Common Pleas Court
Juvenile Division
Trial Court Nos. 11-CS-0008, 11-CS-0009 and 11-CS-0010,**

**Judgments Affirmed**

**Date of Decision:   March 4, 2013**

**APPEARANCES:**

> *Bridget D. Hawkins*  **for Appellant**
>
> *Deborah K. Brown*   **for Appellee, Logan Co. Children's Services**
>
> *Miranda A. Warren*, **Guardian Ad Litem**

**PRESTON, P.J.**

**{¶1}** Mother-appellant, Joann B. Persinger, appeals the judgments of the Logan County Court of Common Pleas, Juvenile Division granting Logan County Children Services ("LCCS") permanent custody of her three minor children.  We affirm.

**{¶2}** On February 9, 2011, a mandatory reporter contacted LCCS concerning the care and well-being of Persinger's three minor children: S.S. (male), born June 2005; J.S. (male), born September 2008; and, K.P. (female),

born December 2010. (Doc. No. 1). The nature of the referral concerned excessive punishment inflicted upon J.S. by Persinger and her roommate, Charles S. Bowman.[1] (*Id*.).

**{¶3}** On February 11, 2011, after investigating the allegations, LCCS filed complaints alleging that the three minor children were dependent and neglected children as defined in R.C. 2151.04 and 2151.03(A), respectively, and a motion for temporary custody of the minor children. (*Id*.); (Doc. No. 2). The matter was assigned trial court case nos. 11-CS-0008, 11-CS-0009, and 11-CS-0010. That same day, the trial court held a hearing and granted LCCS temporary custody of the minor children. (Doc. Nos. 5, 11).

**{¶4}** On April 13, 2012, the trial court held an adjudicatory hearing wherein the State dismissed the neglect allegation in the complaint and amended language in the complaint detailing the dependency action. (Doc. No. 54). Thereafter, Persinger and Brian Otis S., the biological father of S.S. and J.S., admitted to the dependency finding. (*Id*.). The trial court found the minor children to be dependent and granted LCCS temporary custody of the minor children.

---

[1] Although not known at the time the complaint was filed, it was later determined through DNA testing that Bowman was K.P.'s biological father; the father of Persinger's two minor boys is Brian Otis S. (Doc. No. 1). Prior to determining that Bowman was K.P.'s father, notice of the proceedings was made by publication to the "Unknown Father of K.P. (Female)." (Doc. Nos. 4, 19, 42). Brian Otis S. was incarcerated but participated throughout the proceedings (*See e.g.*, Doc. Nos. 25, 27, 42).

{¶5} On April 19, 2011, Bowman was added to the case as a necessary party after DNA testing revealed that he was K.P.'s biological father. (Doc. No. 58).

{¶6} On May 11, 2011, Bowman filed a motion seeking placement or, alternatively, extended visitation with K.P. (Doc. No. 63). On May 13, 2011, the State filed a motion asking the trial court to find that no reasonable efforts were required to reunify K.P. with Bowman since he had been convicted of a sexually oriented offense involving his seven-year-old stepdaughter. (Doc. No. 65).

{¶7} On June 28, 2011, the motions came on for hearing, and Bowman indicated that he would withdraw his motion and would permanently surrender his parental rights to K.P. (Doc. No. 68). The trial court withdrew Bowman's motion, granted the State's motion, and continued temporary custody of the minor children with LCCS. (*Id.*).

{¶8} On June 30, 2011, the Guardian Ad Litem ("GAL") filed a report recommending that Bowman's parental rights to K.P. be permanently terminated since the same was in K.P.'s best interest. (Doc. No. 70).

{¶9} On July 1, 2011, the trial court held a hearing upon Bowman's permanent surrender of parental rights and granted LCCS permanent custody of K.P. with respect to Bowman. (Doc. No. 73).

{¶10} On October 14, 2011, Persinger filed a motion to transfer the case to Champaign County following her relocation and employment in that county. (Doc. No. 80). That same day, the LCCS filed a response asking the trial court to deny the motion since the minor children were already placed in its temporary care and custody and had adjusted to their current foster home. (Doc. No. 81). On October 17, 2011, the trial court denied the motion to transfer. (Doc. No. 82).

{¶11} On February 8, 2012, the trial court granted LCCS' motion for an extension of temporary custody. (Doc. No. 97). On February 15, 2012, LCCS filed a motion seeking permanent custody. (Doc. No. 98).

{¶12} On June 13, 2012, the GAL filed a report recommending that the trial court grant LCCS' motion for permanent custody. (Doc. No. 152). On June 14-15, 2012, the trial court held hearings on the motion, and, on June 16, 2012, granted LCCS' motion for permanent custody. (Doc. No. 156).

{¶13} On August 10, 2012, Persinger filed a notice of appeal. (Doc. No. 163).[2] The cases were assigned appellate case nos. 8-12-06, 8-12-07, and 8-12-08, which this Court subsequently consolidated for appeal purposes.

{¶14} Persinger now appeals raising one assignment of error for our review.

---

[2] Brian Otis S., the father of S.S. and J.S., did not file a notice of appeal and is not participating herein.

**Assignment of Error**

**The Trial Court erred in granting permanent custody of the minor children to the Logan County Children's Services Board.**

{¶15} In her sole assignment of error, Persinger argues that the trial court erred in granting LCCS' motion for permanent custody because she completed her case plan goals; alternatively, she argues she was not given sufficient time to complete her case plan goals. Finally, Persinger contends that the trial court's findings were not supported by clear and convincing evidence.

{¶16} We begin our discussion by noting that "[p]arents have a 'fundamental liberty interest' in the care, custody, and management of [their children]." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). The right to raise one's children is an "essential" and "basic civil right." *Id.*, citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). A parent's right to manage the rearing of his or her children is among those inalienable rights secured by the natural law, which Section 1, Article I of the Ohio Constitution was intended to protect from infringement by the state. *In re J.L.*, 176 Ohio App.3d 186, 2008-Ohio-1488, ¶ 11, citing *State v. Thompson*, 2d Dist. No. 04CA30, 2006-Ohio-582, ¶ 30.

{¶17} "[P]arents have the right of restraint over their children and the duty of correcting and punishing them for misbehavior." *In re Schuerman*, 74 Ohio

App.3d 528, 531 (3d Dist.1991). Parents have the right to use reasonable physical discipline, or corporal punishment, to prevent and punish a child's misconduct. *State v. Hauenstein*, 121 Ohio App.3d 511, 516 (3d Dist.1997) citing *State v. Suchomski*, 58 Ohio St.3d 74, 75 (1991); *In re J.L.*, 2008-Ohio-1488, at ¶ 12; *In re Luke*, 3d Dist. No. 14-10-26, 2011-Ohio-4330, ¶ 21. The right of parents to administer reasonable corporal punishment is deeply rooted in the history and traditions of this nation. *In re J.L.*, 2008-Ohio-1488, at ¶ 12, citing *State v. Hoover*, 5 Ohio App.3d 207, 211 (6th Dist.1982), quoting *Quinn v. Nolan*, 7 Dec.Rep. 585, 586 (1879) ("From the time of Solomon to the present, parents have had the right, in a proper manner and to a proper degree, of inflicting corporal punishment upon their children * * *."). *See also* 1 Blackstone, COMMENTARIES, RIGHTS OF PERSONS, CHAPTER 16: OF PARENT AND CHILD, Section 2 (under the common law, parents may correct an underage child in a reasonable manner).

{¶18} A public children services agency that has been granted temporary custody of a child pursuant to R.C. 2151.352(A)(1) may file a motion requesting permanent custody of the child. R.C. 2151.413(A). When a motion seeking permanent custody is filed, the court is required to schedule a hearing and give notice of the hearing to all parties to the action and to the GAL. R.C. 2151.414(A)(1). The court may grant the motion, if it determines, by clear and convincing evidence, that: (1) granting the motion for permanent custody is in the

best interest of the child; (2) the child is not abandoned or orphaned; and (3) the child cannot or should not be placed with either of the child's parents within a reasonable time. R.C. 2151.414(B).

{¶19} To determine the best interest of a child, the court is required to consider all relevant factors, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised

Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶20} To determine whether a child cannot or should not be placed with either parent within a reasonable period of time, R.C. 2151.414(E) provides a list of factors for the trial court to consider, including, in pertinent part:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative

services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to

prevent the child from suffering physical, emotional, or sexual abuse

or physical, emotional, or mental neglect.

R.C. 2151.414(E).[3] If the court determines, by clear and convincing evidence, that one or more of the aforementioned factors are present as to each of the child's parents, the court is required to find that the child cannot or should not be placed with either parent within a reasonable period of time. *Id.*

{¶21} "Clear and convincing evidence" is more than a mere preponderance of the evidence, but not of such certainty as is required by "beyond a reasonable doubt" as in a criminal case; rather, it is evidence that provides the trier of fact with a firm belief or conviction as to the facts sought to be established. *In re Meyer*, 98 Ohio App.3d 189, 195 (3d Dist.1994), citing *Cincinnati Bar Assn. v. Massengale*, 58 Ohio St.3d 121, 122 (1991). Upon review, an appellate court "'must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.'" *Id.*, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985). A reviewing court will reverse a trial court's determination if it is not supported by clear and convincing evidence. *Id.*, citing *Holcomb*, 18 Ohio St.3d at 368; *In re Adoption of Lay*, 25 Ohio St.3d 41, 42 (1986).

---

[3] LCCS also relied upon R.C. 2151.414(E)(12) in its motion; however, that factor related to incarceration, which LCCS alleged was only relevant to Brian Otis S., not a party to this appeal. (June 14, 2012 Tr. at 9); (June 16, 2012 JE, Doc. No. 156).

**{¶22}** The State presented the testimony of several witnesses at the hearing. Aiden Flanigan, an LCCS investigative specialist, testified that he investigated a referral concerning physical abuse of the minor children by Persinger and Bowman. (June 14, 2012 Tr. at 80-81). Flanigan testified that Brian Otis S. is the biological father of S.S. and J.S., and Charles Bowman is the biological father of K.P. (*Id*.). Persinger stated she was concerned that S.S. was schizophrenic, and they had to call the police on one occasion because his behaviors were so extreme. (*Id*. at 83-84). Flanigan testified that Persinger told him that J.S. was extremely destructive, destroying blinds, pulling off trim, and putting holes in the walls. (*Id*. at 82). Persinger stated that, when J.S. engaged in this destructive activity, she spanked him repeatedly, four to five times for each incident, until his butt was "fire engine red," for a total of 20 to 30 spanks. (*Id*. at 80-82). Flanigan testified that Persinger admitted to disciplining J.S. in this manner over a weekend, and he observed bruising on J.S.'s bottom several days later. (*Id*. at 85-86). Persinger told him that, when she spanked J.S., she made sure to remove his pull-up diaper and underwear so J.S. could feel it, and if J.S. laughs, she continues to spank him until he stops. (*Id*. at 84-85). Persinger told Flanigan that a counselor instructed her to spank the children until the children respond emotionally and cry; otherwise, the children do not get the message. (*Id*. at 85). Flanigan testified that Persinger told him that J.S. was 18 months old, when J.S. was actually two and a

half years old. (*Id*. at 84). Flanigan testified that he was concerned that the aforementioned discipline was excessive in light of J.S.'s age and behavior. (*Id*.).

{¶23} Flanigan also testified that Persinger indicated that she would put J.S.'s hands behind his back and hold them tightly to prevent J.S. from moving his hands, and that she would have Bowman step in when she became tired. (*Id*. at 83). Persinger demonstrated how she held J.S.'s hands, and pressed hard on the inner part of Flanigan's wrist and held his hands tightly. (*Id*.). At first, Persinger denied using tape to hold J.S.'s hands behind his back, but later that day, Persinger admitted she did use masking tape on J.S.'s hands so they could get things done around the house. (*Id*.); (*Id*. at 85).

{¶24} Flanigan testified that J.S. and S.S. were removed and placed with Gary Stapleton and another male, neighbors who occasionally watched the boys. (*Id*. at 86). However, LCCS subsequently filed for emergency custody after they learned that Stapleton used a fly swatter to discipline J.S. (*Id*. at 86-87). According to Flanigan, Stapleton demonstrated how he would raise the fly swatter in the air and J.S. would cower in fear. (*Id*.). Persinger denied any physical relationship with Bowman, calling him merely a roommate, though she later admitted that Bowman could be K.P.'s father, testified Flanigan. (*Id*.). Flanigan was involved in the case for 30 days, and then the case was transferred to

Christenen. (*Id*. at 87-88). Persinger reported that Brian Otis S. abused S.S., though she did not describe the abuse, according to Flanigan. (*Id*. at 88).

{¶25} On cross-examination, Flanigan testified that LCCS did not remove the children due to spanking; but rather, LCCS removed the children because J.S. was spanked 20-25 times and Persinger admitted she would continue spanking J.S. until he cried and responded emotionally. (*Id*. at 88-89). When asked if he knew the time frame for the 20-25 spanks J.S. received, Flanigan testified that he only knew it happened over a weekend after J.S. put holes in the wall. (*Id*. at 89-90). Flanigan could not tell from the bruising if J.S. had been spanked with the belt during this same incident, but Bowman admitted using a belt in the past to spank J.S. while Persinger held J.S. down. (*Id*. at 92). Persinger knew Stapleton for a long time, according to Flanigan, though he could not recall their relationship, if any, and he testified that Stapleton and the other man were low functioning, over fifty with no other children residing in their home. (*Id*. at 91, 93-94). LCCS did not believe Stapleton was physically disciplining the children but merely threatening physical discipline with the fly swatter. (*Id*. at 88-90). Flanigan testified that J.S.'s response to the fly swatter indicated that he was used to being struck. (*Id*. at 90). He also testified that, when he first came to the home, S.S. and K.P. were "extremely, extremely, extremely dirty." (*Id*.). On the other hand, Flanigan testified that the home was "extremely, extremely clean * * * not a thing

-14-

out of place," which he believed caused the discipline since nothing could be out of place. (*Id*. at 92-93). On re-cross examination, Flanigan testified that the bruising he observed on J.S. was all on his buttocks, and LCCS initially became involved due to the excessive discipline. (*Id*. at 94-95).

{¶26} Chris Christensen, a long-term placement caseworker with LCCS, testified that he was assigned to Persinger's three minor children, S.S., J.S., and K.P. (*Id*. at 96-97). Christensen testified that Persinger entered into a case plan with the goal of reunification. (*Id*. at 97). Christensen testified that Brian Otis S. was not included on the case plan since he was incarcerated until April 13, 2014. (*Id*.). Christensen testified that Bowman was adjudicated the father of K.P., but he surrendered his parental rights to K.P. (*Id*. at 98). Christensen testified that, as part of the case plan, Persinger was required to provide a stable and safe home environment for her children; be capable of dealing with the behaviors of S.S. and J.S.; go to counseling sessions; be involved in the medical and educational needs of the children; and, obtain a psychological evaluation. (*Id*. at 99).

{¶27} Christensen testified that Persinger began counseling with Ruth Montgomery at CAM; and in November 2011, Persinger began counseling with Deb Brownlee. (*Id*. at 99-100). He testified that Persinger had her initial assessment with Brownlee, though Persinger lacked follow through on follow up sessions. (*Id*. at 100). According to Christensen, Persinger was required to attend

counseling for emotional issues due to the removal of her children and relationships. (*Id*). He further testified that LCCS provided Persinger flexibility to attend her mandatory parenting classes in Urbana, where she lived, since transportation was an issue. (*Id*.). Christensen testified that Persinger attended nine parenting classes, and that she found independent housing from July 15, 2011 until July 2012, as required by the case plan. (*Id*. at 101-102). Persinger worked part-time at Wendy's from October 2011 to December 2011, but she was jailed from December 8, 2011 until December 15, 2011 for non-support, according to Christensen. (*Id*. at 102). Christensen testified that Persinger was subsequently sentenced to six months in jail for failure to pay a $30,000.00 child support arrearage. (*Id*. at 102-103, 105).

{¶28} Persinger has not been able to obtain employment and meet the children's ongoing needs, such as food, according to Christensen. (*Id*. at 104). Christensen testified that Persinger's church friends have maintained her apartment while she is incarcerated. (*Id*.). He also testified that Persinger received around $15,000 from her mother's estate, which Persinger used to pay a year's worth of rent (from July 2011 to July 2012). (*Id*.). Christensen testified Persinger's church friends may be paying for August rent, but he is not sure how Persinger intends to pay rent thereafter. (*Id*.). Persinger has not divulged whether or not she has any money remaining from her mother's estate, and Persinger did

not use any of her inheritance to pay her child support arrearage, testified Christensen. (*Id*. at 105).

**{¶29}** Christensen testified that Persinger did not complete her case plan goals with respect to visitation because it is still difficult for her to deal with S.S.'s behaviors and give an adequate amount of time to all of her children. (*Id*. at 103). Christensen testified that the agency initially transported the children to Caring Kitchen, where Persinger was residing, for a one-hour visitation period once a week. (*Id*. at 105-106). LCCS asked Persinger to begin coming to the agency for visitations, which she did, and the visitation was increased to two hours. (*Id*. at 106). According to Christensen, Persinger asked for divided visitation, one hour with K.P. and one hour with J.S. and S.S., in order to better bond with K.P., which the agency found agreeable. (*Id*.). Christensen testified that LCCS terminated visitation after Persinger was incarcerated due to the possible negative impact on the children. (*Id*. at 107). Christensen testified that his only other concern was Persinger's admission that she put a gun to her ex-mother-in-law's head when her two older children were removed from her home. (*Id*.).

**{¶30}** On cross-examination, Christensen testified that the incident with the ex-mother-in-law occurred many years ago when Persinger was using drugs. (*Id*. at 107-108). He testified that he still has concerns with Persinger's difficulty dealing with S.S.'s temper tantrums, and her continually siding with S.S. in

disputes with J.S. (*Id*. at 108). Christensen also noted a lack of emotional bond between Persinger, J.S., and K.P. (*Id*.). Christensen testified that on one occasion when S.S. threw a temper tantrum and became verbally abusive because he wanted to go to a certain place in the playground and did not want to invite J.S., Persinger did not know what to do. (*Id*. at 109). He also testified that, during visitations, Persinger would not respond when S.S. would call her an idiot. (*Id*.). Christensen testified that he observed Persinger in the home with the children, and she provided appropriate meals and planned appropriate activities for the children. (*Id*.). Concerning the children's relationships in the foster home, Christensen testified that: S.S. is very obedient and compliant with the rules in his foster parents' home, has adjusted well within the home, and does not have any negative behaviors; J.S. is less introverted and has been more social with his foster parents and siblings, and J.S. has a good bond with MacKenzie, a foster sibling; and, K.P. has a strong emotional bond with the foster parents. (*Id*. at 110). Christensen testified that LCCS explored kinship placement with grandparents but they were ruled out due to their age and health concerns. (*Id*. at 111). He also testified that LCCS asked Persinger's sister, Paula Frew, if she would consider taking the children, but she declined due to her employment situation, her education, and her family situation. (*Id*.). Christensen testified that it was not clear whether or not Persinger was in a relationship during the case, but he did learn that Persinger was

communicating with Bowman while she was at Caring Kitchen. (*Id*. at 112). He also testified that Persinger subsequently rekindled a relationship with David Sprinkle. (*Id*. at 113). Christensen testified that it would be in the children's best interest to grant LCCS permanent custody because Persinger does not have the ability to meet the children's collective needs, specifically S.S.'s behavioral issues. (*Id*.). She is also unable to maintain employment and it is unclear whether or not she can maintain her home, though she would be eligible for assistance through job and family services. (*Id*.). Christensen also testified that Marilyn Cohn was assisting Persinger with her budget, and once Persinger obtained her own residence, she had a close friend, Bill Yates, manage her finances. (*Id*. at 114).

{¶31} On further cross-examination, Christensen testified that Persinger had employment, though it was questionable whether or not her home environment was stable. (*Id*. at 115). Christensen also testified that Persinger had housing for a year since she paid for her rent, and he was not sure how much money she used to pay for a year's worth of rent. (*Id*. at 116). Christensen testified that Persinger missed one counseling session because she was likely incarcerated. (*Id*. at 117). He also testified that Persinger is continuing to receive counseling while she is incarcerated, and he has no evidence that Persinger has neglected the medical needs of the children. (*Id*.). Christensen testified that Persinger has been involved in one medical appointment for S.S.'s surgery, but

she has not attended other medical appointments, though he admitted transportation was an issue for Persinger since she did not have a vehicle. (*Id*. at 117-118). He testified that, basically, the only thing Persinger has failed to complete in the case plan is to handle the behaviors of J.S. and S.S. (*Id*. at 118, 120). Christensen also identified the lack of a bond between K.P. and Persinger as a continuing problem. (*Id*. at 120). He testified that LCCS did not provide Persinger with visitations while she was incarcerated even though there was a visitation room because they feared that Persinger's emotions would negatively impact the children. (*Id*. at 121-122).

{¶32} Christensen testified that he did not observe a bond between S.S., J.S., and Persinger during the visitations. (*Id*. at 124). He further testified that J.S. would play independently during the visitation and would not incorporate his mother. (*Id*.). According to Christensen, Persinger would try to converse with J.S. but her primary focus was dealing with S.S.'s behavior. (*Id*.). On the other hand, Christensen testified that S.S. did not need to be the center of attention when he was in the Frost home, and he plays well with J.S. and his foster siblings. (*Id*. at 125). He testified that his primary issue with Bowman was the physical abuse that occurred with J.S., and he was a registered sex offender for an offense occurring with one of his step daughters. (*Id*. at 126). Christensen testified that S.S. told the foster parents that Bowman touched his pee-pee, but he was not sure

if that statement was prompted by the foster parents' leading. (*Id*. at 127). Christensen testified that none of the children showed signs of sexual abuse, though Persinger expressed concern over Bowman having unsupervised visits with K.P. (*Id*. at 128). On re-direct, Christensen testified that Persinger indicated that she would like J.S. and S.S. to have a relationship with their father after he is released from prison. (*Id*. at 128-129). Christensen testified that Brian Otis S. was incarcerated for his failure to pay child support for his two older children adopted by his mother and father. (*Id*. at 129). He further testified that S.S. has improved with the foster parents, though S.S. regresses when he visits Persinger. (*Id*. at 130).

{¶33} Nicholas Russell, a counselor at Consumer Advocacy Model ("CAM"), testified that S.S. began counseling sessions with Robin Hemminger on April 26, 2010. (*Id*. at 70-72). Russell testified that Hemminger transferred S.S. to him in September 2010, at which point he met Persinger, who was S.S.'s legal custodian. (*Id*. at 72). Russell testified that S.S. was unruly, suffered from attention deficient hyper activity disorder, and was, generally, uncontrollable. (*Id*.). S.S. was diagnosed with encopresis, or bowel movements, without overflow or constipation, and enuresis, according to Russell. (*Id*.). Russell testified that S.S. was not toilet trained, and he was voiding in inappropriate places and at inappropriate times. (*Id*.). Russell testified that, due to transportation issues,

Persinger was treating S.S.'s CAM appointments as all-day events, causing S.S. to lose attention and focus, and causing difficult counseling sessions. (*Id*. at 73). S.S. was subsequently referred to psychiatric case management services to help with transportation. (*Id*.). Russell further testified that S.S. had a very difficult time at the beginning of the counseling sessions and was "[v]ery much out of control." (*Id*. at 74). According to Russell, S.S. had to be restrained from running into the parking lot, and, one time, S.S. broke a handicapped-accessible door that was not opening on his terms. (*Id*.). Russell testified that most of S.S.'s behavioral problems occurred before and after the counseling sessions, and that S.S. responded well to clear boundaries within the confines of his office or the play therapy room. (*Id*.). Russell testified that S.S. is currently being successfully discharged from CAM counseling, and S.S. does not have any mental disorders that need diagnosis or treatment at this time. (*Id*. at 75). Russell testified that he thought S.S. was still taking some medications for his attention disorder. (*Id*.). On cross-examination, Russell testified that he had not seen S.S. since March [2012], and Persinger initially brought S.S. for counseling. (*Id*. at 76). He further testified that S.S. did not bring up any sexual abuse, though that may be an issue S.S. will address later in life. (*Id*. at 76-77). Russell testified that he never addressed S.S.'s social awkwardness, though S.S. may benefit from further

counseling for socialization, and S.S. could be reassessed in the fall for an IEP. (*Id*. at 78).

{¶34} Erin Miller, a part time case aide and part time in-home caseworker with LCCS from December 2010 to October 2011, testified that she supervised a number of Persinger's visits with her three children in Urbana and at the agency. (*Id*. at 54-55). Miller testified that Persinger usually visited her children for two hours on alternating weekends at the agency and in Urbana, with transportation assistance from LCCS. (*Id*. at 55). Miller testified that the visitations generally went very well, though there was one incident when J.S. wandered toward the road. (*Id*. at 56). Persinger shared too much information with the children, according to Miller; for example, Persinger shared information about body parts with S.S. when she was using the restroom and told her children she was using contraceptives when they were conceived. (*Id*. at 57). Miller testified that Persinger had difficulty following visitation time constraints, causing them often to rush through meals. (*Id*. at 58). Miller testified that, one time, Persinger allowed J.S. and S.S. to feed bread to ducks in a park, even though the park had posted signs stating not to feed the ducks. (*Id*.). Miller testified that the boys really enjoyed this activity. (*Id*.); (*Id*. at 59). Miller testified that she noticed a significant improvement in Persinger's judgment from the time she started the visitations, especially when Persinger began bringing meals for the children. (*Id*.

at 58-59). On cross-examination, Miller testified that LCCS placed time constraints on the visitations, not Persinger. (*Id.* at 59).

{¶35} Krista Brey, a LCCS case aide, testified that she supervised three visitations with Persinger. (*Id.* at 61). Brey testified that one of the visitations occurred in Persinger's apartment in Urbana, which Brey described as appropriate and clean. (*Id.* at 62). Brey testified that, overall, the visitations went well, though she thought Persinger communicated with her children inappropriately, calling S.S. and J.S. her "sexy little men." (*Id.*). Brey also testified that, one time after the children were messy from eating dinner at the agency, J.S. wanted to change his clothes, and J.S. stated, "look, my underwear has a penis pouch." (*Id.* at 62-63). According to Brey, Persinger then looked at S.S. and said, "[S.S.], tell us your nickname for your penis, that you used to call your penis." (*Id.* at 63). Brey also testified that, when she made an in-home visit in January, Persinger answered the door in her bathing suit, and Persinger had the children change into their bathing suits and join her in a baby pool that Persinger had in her dining room. (*Id.* at 63). Persinger stated that an LCCS employee, Emily Pool, gave her permission to have the baby pool in the house for the children. (*Id.*). Brey testified that Emily actually told Persinger she could take the children to the YMCA pool. (*Id.* at 64). Brey testified that one of Persinger's friends was in the apartment during the visitation and stated that she was moving in with Persinger

since her boyfriend had been stalking her. (*Id*.). Brey testified that she is concerned about Persinger exercising appropriate judgment with the children, keeping the children safe, and Persinger's interactions and communications with the children. (*Id*.). Brey testified that she had difficulty getting K.P. to let go of the foster mother when she would take K.P. for visitations. (*Id*. at 65). On the other hand, Brey testified that she had no problem getting K.P. to leave Persinger after visitation was over. (*Id*.). Brey testified that, one time, when an agency worker came in to get the children ready to leave visitation, the children ran into the agency worker's arms and got ready to leave. (*Id*.). Brey testified that Persinger loves her children very much, enjoys being with her children, and preparing appropriate meals for her children. (*Id*.).

{¶36} On cross-examination, Brey testified that she only supervised three visits for a total of six hours. (*Id*. at 66). Brey testified that the interaction between Persinger and the children was pretty good. (*Id*.). She also testified that the apartment was warm during the pool incident, and the children appeared to have fun. (*Id*. at 66-67). She testified that the children were in no danger, and the pool had about six inches of water. (*Id*. at 67). Brey testified that she was not sure whether Persinger's friend, who she talked with during the visitation, lived with Persinger or lived next door to Persinger. (*Id*.). Brey also testified that, since K.P. was taken from Persinger at seven weeks old, she would expect that K.P. had a

stronger bond with the foster mother. (*Id*. at 67-68). Brey testified that, one time, Persinger left K.P. in a booster seat for an extended period of time, and K.P. threw her food on the floor. (*Id*. at 69). She also testified that, one time, S.S. hit Persinger on the head, and Persinger properly disciplined him. (*Id*.).

{¶37} Grace Shoessow, an early childhood mental health consultant, testified that she provided weekly, in-home coaching sessions to help Persinger with parenting and understanding her children's needs. (*Id*. at 132-133). In particular, Shoessow testified that she was helping Persinger develop consistency in her responses to her children's actions and helping her develop the ability to multi-task with three children in the home. (*Id*. at 135). Shoessow testified that Persinger enjoyed preparing and bringing the children meals and this was an area of strength for Persinger. (*Id*. at 136). Shoessow testified that Persinger was always very willing to participate in the parenting classes and was able to put the curriculum into practice during the activity sessions, but she had difficulty implementing the curriculum with the children. (*Id*.). Persinger had the most difficulty with identifying and meeting the needs of each child according to their developmental stage and recognizing that their needs were changing as they were growing up, according to Shoessow. (*Id*.). Shoessow further testified that Persinger was under a high level of stress and anxiety, which affected her ability to focus on the needs of her children. (*Id*. at 137). She testified that Persinger was

"very agreeable" and she enjoyed working with her, but Persinger was unable to maintain her improvements from session to session. (*Id.* at 137-138).

**{¶38}** According to Shoessow, another issue that affects Persinger's parenting is the importance she places on relationships with men to her self-concept. (*Id.* at 139). Shoessow testified that Persinger saw her children as extensions of herself rather than as individuals with their own rights. (*Id.*). She testified that Persinger is a "very loving and demonstrative mother" and enjoys interacting with her children; however, Persinger has difficulty interacting with one child while at the same time monitoring the safety of the other children. (*Id.* at 140). Shoessow testified that Persinger often stressed about her finances, and she was having a difficult time adjusting to living on her own in a large home. (*Id.* at 140-141). Shoessow testified that Persinger had given up custody of her two older children to a family member, and Persinger was unclear about her financial obligations to those two children. (*Id.* at 142). Shoessow testified that Persinger loves her children and has made efforts to meet their needs, but Persinger lacks the ability to meet the needs of the children, particularly their emotional needs. (*Id.* at 143).

**{¶39}** Debra Brownlee, a counselor/therapist at Consolidated Care Inc., testified that Persinger began depression counseling at Consolidated beginning in April 2009, and Persinger was transferred to her care in May 2009. (*Id.* at 148-

149). Brownlee testified that she saw Persinger for a little more than a year, and she was originally diagnosed with "Depression NOS," meaning Persinger had symptoms of depression but not enough to make a full diagnosis, and a personality disorder. (*Id*. at 150). Brownlee testified that Persinger was consistent with her counseling and was focused on keeping her son from becoming aggressive like his father. (*Id*. at 151). Brownlee testified that Persinger had difficulty following LCCS' recommendations when she thought she had a better way of doing things. (*Id*. at 152-153). Persinger quit counseling in July 2010, according to Brownlee, and then Persinger began a new round of counseling through LCCS beginning in November 2011, though she only saw Persinger twice. (*Id*. at 153).

{¶40} According to Brownlee, Persinger indicated that she was having "psychotic episodes" since her mother passed away, where she becomes dizzy, cannot see or focus, and is fatigued all day. (*Id*. at 154). Brownlee testified that she changed Persinger's diagnosis to depressive disorder NOS, a psychotic disorder NOS, and a personality disorder. (*Id*.). Describing one of her psychotic episodes, Persinger told Brownlee that, while she was driving to Dayton, she saw a car going up in front of her and coming back and things were jumping, so she had to pull over. (*Id*. at 154-155). Brownlee would not classify these episodes as "anxiety attacks." (*Id*. at 157-158). Brownlee also testified that Persinger informed her that sexual charges were pending or had already been resolved

against a man she was currently seeing. (*Id*. at 155). Persinger told Brownlee that this man took a bath with the young daughters of his wife or girlfriend, but the man explained that he had a long t-shirt on at the time. (*Id*.). Brownlee told Persinger that she did not think her children would be safe around this man. (*Id*. at 156). On cross-examination, Brownlee testified that Persinger reported in January 2012 that she has had epileptic seizures since K.P.'s birth. (*Id*. at 157). She testified that Persinger's stress and depression may have been partially caused by the loss of custody of her older children. (*Id*. at 158).

{¶41} Marilyn Cohn, the assistant director of a shelter in Urbana called Caring Kitchen, testified that Persinger was a client who stayed in the facility twice, from February 11, 2011 to March 17, 2011; and, from March 23, 2011 to July 30, 2011. (*Id*. at 161-163). Cohn testified that Persinger did not comply with the shelter rules when she left without letting anyone know where she was going. (*Id*. at 163). Cohn testified that Persinger apologized and promised to do better, so Caring Kitchen allowed her to return for a second time. (*Id*.). Cohn testified that she assisted Persinger in obtaining social services, including counseling at CAM, counseling with Brownlee, Job and Family Services aide, and assistance from Brandon Deskins, with adult parole. (*Id*.). According to Cohn, Persinger was also referred to the health department to take several pregnancy tests, and Persinger

was seeing males while she was staying at the shelter; first, Tony Fraley and then, David Sprinkle. (*Id*. at 164).

**{¶42}** Cohn testified that Persinger was required to meet with her on a daily basis, and Persinger made major improvements from the first stay to the second stay at the shelter. (*Id*. at 165). Cohn testified that Persinger was clean, really wanted to get her children returned, was following through on her appointments, looking for jobs, and "100 percent" better than her first stay at the shelter. (*Id*.). Persinger obtained a PRN job at Wendy's and was looking for another job, testified Cohn. (*Id*.). Cohn testified that Persinger was making better decisions, though she still had some difficulty finding a job. (*Id*. at 166). Persinger indicated that she received around a $10,000 inheritance from her mother, though Persinger thought it was going to be more than that. (*Id*.). She also testified that Deskins talked to Persinger about using some of the inheritance to pay her child support arrearage to stay out of prison, but Persinger was concerned about getting housing so she paid a year's worth of rent, instead. (*Id*. at 167). Cohn testified that the father of Persinger's last child, Bowman, would call Persinger often while she was staying at the shelter the first time, but Persinger subsequently told him to stop calling. (*Id*. at 167-168). Cohn testified that her concern for placing the children with Persinger would be that she has no place to live and she does not have any

employment. (*Id*. at 169). She testified that Persinger loves her children and would like to do what is best for them. (*Id*. at 170).

{¶43} On cross-examination, Cohn testified that Persinger was not a full-time employee at Wendy's and was getting about ten hours per week when she was working there. (*Id*. at 171). Cohn testified that Tony Fraley was living at Caring Kitchen for a period of time as well, and Persinger went to church with Fraley. (*Id*.). Cohn did not express any concerns about Sprinkle, but Cohn testified that Fraley was "very unstable," mentally speaking. (*Id*. at 172). On re-direct, Cohn testified that Persinger enjoyed Wendy's and wanted more hours. (*Id*.).

{¶44} Dr. Glen Feltz, a licensed clinical psychologist, testified that he examined Persinger and determined that she had no signs of psychosis or extreme depressive mood state; she had complete orientation, awareness of the surroundings and who she was and where she was; she had no suicidal or homicidal ideations; and, she had good eye contact and fluent speech. (*Id*. at 12-14, 16, 26). According to Dr. Feltz, Persinger scored an 82 on the Stanford Binet cognitive test, meaning she was "at the low-average intellectual range, indicating [she] had adequate intellectual abilities to respond to the world and incorporate information from her environment." (*Id*. at 17). Persinger's Minnesota Multiphasic Personality Inventory ("MMPI") revealed that she had a sound

personality, with no evidence of psychosis, severe depressive state, or mania such as bipolar condition. (*Id*. at 17-18). On the negative side, Dr. Feltz testified that Persinger's MMPI revealed that she did not follow societal rules well, but rather, preferred her own way of doing things. (*Id*. at 18). Persinger had a strong belief in her ability to take care of things and to make decisions on her own and was not likely to incorporate suggestions from others, according to Dr. Feltz. (*Id*.).

{¶45} Dr. Feltz testified that Persinger's Parenting Stress Inventory ("PSI") relative to S.S. revealed that "she had fairly good knowledge about what would be required to be a parent," and she saw S.S. as "somewhat demanding," meaning S.S. requires a lot of her attention. (*Id*. at 19-20). Dr. Feltz testified that Persinger felt "a degree of warmth in dealing with [S.S.]. She felt connected to the child. She did not feel like the child intruded on her lifestyle." (*Id*. at 20). Persinger exhibited signs of stress, though the source of that stress did not originate with her being a parent, according to Dr. Feltz. (*Id*.). Dr. Feltz testified that Persinger's "CRI" test, a test designed to determine how individuals cope with challenging situations, indicated that Persinger felt she had a good ability to respond to her environment, but Persinger would tend to avoid problems, even though she may feel confident to handle them. (*Id*. at 21-22, 31). Dr. Feltz further testified that Persinger's Bender Gestalt test results indicated the possibility of some "extreme emotional kind of disturbance," which is usually a learning disability. (*Id*. at 22-

23).   Persinger, testified Dr. Feltz, demonstrated no strong indicators of any psychosis, and her Parenting Structure and Interview tests revealed that she understood her role as a parent, including proper discipline.  (*Id*. at 24-25).

**{¶46}** Dr. Feltz identified State's exhibit five as a copy of his report.  (*Id*. at 26).  He also testified that Persinger does not respond to the world emotionally but "from a practical pragmatic task-oriented" state of reference.  (*Id*. at 26-27). When asked about an incident when Persinger told her children, "Mommy is a big ice cream cone. Come lick me" during an agency visitation, Dr. Feltz testified that Persinger stated she meant it as a playful thing, and she realized that it was inappropriate and apologized for the incident.  (*Id*. at 27).  Dr. Feltz testified that Persinger has high dependency needs, meaning that she sought to get her emotional needs met through relationships, and he expressed concern that Persinger's dependency needs could interfere with her ability to recognize her children's needs.  (*Id*. at 28).  Dr. Feltz testified that Persinger had some attention-seeking tendencies, and it was difficult to know whether she could set her needs aside for her children's needs.  (*Id*. at 29).

**{¶47}** On cross-examination, Dr. Feltz testified that Persinger was not out of the normal range for any psychological disorders, and he did not observe any "serious personality concerns" with Persinger.  (*Id*. at 30, 32).  Dr. Feltz also testified that Persinger's test results indicated that she answered truthfully, and

-33-

was not trying to portray herself in a positive light. (*Id.* at 33). Dr. Feltz diagnosed Persinger with "Dependent Personality Disorder," meaning that she is an individual who, whether she has the ability to or not, depends on other people or circumstances to solve her problems and meet her needs. (*Id.* at 34). She is generally passive in relationships and responding to challenges, hoping someone else is going to take care of her problems, according to Dr. Feltz. (*Id.*). Having this disorder does not necessarily mean Persinger is a poor parent, according to Dr. Feltz. (*Id.* at 36).

{¶48} Sara Frost, a certified foster parent with LCCS, testified that she and her husband, William Frost, have served as J.S., S.S., and K.P.'s foster parents since February 10, 2011. (*Id.* at 38-39). Sara testified that the children appear to be thriving in their home. (*Id.* at 40). She testified that S.S. is like a "big brother" to J.S., and her son, Trenton, who is four. (*Id.* at 39-40). Sara testified that K.P. is a little over one and a half years old and follows around the boys quite a bit. (*Id.* at 40). Sara testified that all of the children treat her oldest daughters, Brittany Profitt (23) and Brooke (22), as big sisters, and the children know her parents and an older couple in the neighborhood who baby sit them, Hope and Kenny Martin, as "grandma" and "grandpa." (*Id.* at 39, 41). Sara testified that her husband is employed at Mid States Packaging, and she is a full-time mom. (*Id.* at 41).

{¶49} Sara testified that S.S. had eye surgery, was taking Concerta for his ADHD and Risperidone for aggression, but S.S. is no longer taking Risperidone. (*Id.* at 41-42, 45). K.P. may need surgery for her ears and tear ducts. (*Id.* at 42). Sara testified that all the children have had their required immunizations and regular check-ups. (*Id.*). According to Sara, sometimes after visiting with Persinger, S.S. and, to a greater extent J.S., must calm down. (*Id.*). Sara testified that S.S. was on an IEP during kindergarten, but he will not be on an IEP in first grade. (*Id.* at 43). S.S. is a very smart child, according to Sara, though he had problems urinating himself at school. (*Id.*). When asked to explain the differences between S.S. when he first came to their home and now, Sara testified:

> The best way I can describe [S.S.] when – the difference, he was a bit wild. Very hard to settle down. He had a hard time calming down. He had a lot – a little disregard for people around him. For example he was playing. He would just like…say he was on his trike. He would just run the other child over like he didn't even see them there. [S.S] was soiling his pants. He had smeared his bowel movements around the house. He destroyed property. He urinated in his bed nightly. And he had a hard time, just even when he did use the restroom, he would make a mess. He had a hard time using the toilet. Even to get a baby-sitter, he would just throw fits on

them. He was very similar to a 2-year old child throwing fits and not being potty trained. All of that has changed now. He is just…he just does…very well. He can calm himself down. He is doesn't [sic] soil his bed or his pants. He doesn't wet his bed. So, all of those bad things, I guess I said prior, he doesn't do now.

(*Id*. at 43-44). Sara testified that S.S. had been attending counseling through a CAM program in Urbana, which they continued until the counselor felt he did not need further counseling. (*Id*. at 44-45). Sara testified that J.S. is two and one-half years old and is not quite potty trained. (*Id*. at 45). J.S. is very shy and timid and when he first came to their home, he would hide under the table a lot, especially if they raised their voice to him, according to Sara. (*Id*. at 45-46). Sara testified that J.S. does not behave this way anymore and now hugs them freely when he was shy to hug them before. (*Id*. at 46). Sara testified that she received K.P. as an infant, and that K.P. is simply growing up. (*Id*.). On cross-examination, Sara testified that S.S.'s CAM counselor, Nick, told her that Persinger brought S.S. for counseling to address his aggressive behavior. (*Id*. at 46-47). Sara testified that Persinger regularly exercised her visitation rights except after she was incarcerated. (*Id*. at 47-48)

{¶50} William Frost, Sara's husband, testified that all of the minor children get along with members of his family, and they do many family activities. (*Id*. at

49-50). William testified that they have a family routine, each family member has chores around the home, and they eat dinner together each night as a family. (*Id*. at 51). He testified that S.S. is getting ready to start soccer, and J.S. and Trenton may be starting karate in the fall. (*Id*.). William testified that, since he has been in their home, S.S. has settled down significantly and is no longer taking as many medications. (*Id*.). S.S. is now fully potty trained and has begun sharing and talking with the family better, according to William. (*Id*.). S.S. is also no longer on an IEP and doing great in school. (*Id*.). William testified that S.S. reads a lot and has fit in with his children, Trenton and MacKenzie,[4] very well. (*Id*. at 51-52). J.S. was a little timid when he first came to their home, but Trenton and J.S. are like two little brothers that cannot be separated, testified William. (*Id*. at 52). According to William, J.S. does very well with his sister, K.P., his brother S.S., and with MacKenzie. (*Id*.).

{¶51} Miranda Warren, the guardian ad litem (GAL), testified that she recommended that the trial court grant LCCS' motion for permanent custody in her report filed on June 13, 2012. (*Id*. at 144-145). Warren testified that she has concerns about Persinger's ability to maintain the children's basic needs for hygiene and cleanliness. (*Id*. at 145). Warren testified that when K.P. was removed from the home, it appeared that she had not been bathed since returning

---

[4] The transcript has two different spellings of this name, including "McKenzie" and "MacKenzie." (June 14, 2012Tr. at 40, 51-52). We elect to use the latter spelling herein.

from the hospital. (*Id.*). Warren also expressed her concern that Persinger placed J.S. with two gentlemen for housing purposes alone, not babysitting purposes. (*Id.*). She further testified that she has been really impressed with S.S.'s improvements while he has been with the Frosts, which she credited to the Frosts' parenting skills. (*Id.* at 146). Warren also testified that she was concerned with Persinger's relationships with sex offenders and her willingness to bring those men into relationship with her minor children. (*Id.*). According to Warren, Persinger's biggest downfall as a parent was her need for male companionship to the detriment of her children's safety and well-being. (*Id.* at 146-147). Warren testified that, despite her lack of parenting skills, Persinger loves her children. (*Id.* at 147-148).

{¶52} Sara Elliot, a kindergarten teacher at Indian Lake Elementary School, testified that she had S.S. in her previous year's class, and that S.S. made significant progress while in school. (*Id.* at 173-174). Elliot testified that S.S. has always been well-behaved, has honed his fine motor skills, and is reading above grade level. (*Id.* at 174). She testified that, at the beginning of the year, S.S. had problems going to the bathroom on the school bus because he was not using the bathroom all day while at school. (*Id.* at 175). Elliot testified that, by the end of the school year, S.S. was asking to go the bathroom and the problem was resolved. (*Id.*). Elliot described S.S. as "a great kid. Very eager to please. Very well

behaved. Polite. Just a good -- he is a good kid * * * I would like to have several more like him." (*Id*.).

**{¶53}** Paula Frew, Persinger's younger sister, testified that Persinger has two older children, Phillip and Kyle, from her first husband, Phillip Persinger. (*Id*. at 177-178). Frew testified that her sister left Phillip after he became abusive. (*Id*. at 178). Frew testified that Persinger told her that she voluntarily gave custody of her two older boys to her ex-mother-in-law and ex-father-in-law; but later, Persinger told her that the boys were taken from her due to her drug use. (*Id*. at 179). Frew testified that her sister was aware of her child support obligation, though she did not exercise parenting time with the boys or really acknowledge them anymore. (*Id*.).

**{¶54}** Frew further testified that her sister never married S.S. and J.S.'s father but lived with him in their parents' home. (*Id*. at 180). Frew testified that their mother wanted the boys' father out of the home because he was verbally abusive to the boys. (*Id*.). She testified that Persinger stayed in the home taking care of their mother, who was bed-ridden, until their mother passed away. (*Id*.). After that, in December 2010, Persinger moved into Bowman's house, according to Frew. (*Id*. at 181). Frew testified that LCCS became involved after Bowman hit S.S. with a belt four times, and S.S. told his teacher about the incident. (*Id*.). Frew testified that Persinger did not view this discipline as inappropriate;

Persinger was upset because LCCS was removing her children; Bowman kicked her out; and, Persinger had nowhere to go. (*Id*. at 181-182). Frew testified that her mother was very emotionally abusive towards her, but she "doted" on Persinger; on the other hand, Frew's father was physically abusive toward her, but failed to give Persinger any attention. (*Id*. at 182). Frew further testified that Persinger indicated that she had been diagnosed as bipolar while she was staying in the shelter. (*Id*.).

{¶55} Concerning Persinger's parenting, Frew testified that "she tries and she means well," but she is not sure Persinger has the ability to implement correct parenting. (*Id*. at 183, 185). Frew testified that, one time when she accompanied Persinger during a visitation, Persinger planned an activity with toxic paint that was all over the children and near their food, and Frew was especially concerned that K.P. would put the paint in her mouth. (*Id*. at 183-184). Frew testified that Persinger had a lot of learning difficulties when she was growing up due to her seizures and the medication she was taking for the seizures. (*Id*. at 184). On cross-examination, Frew testified that Persinger did a very good job of caring for their mother, even though she had two children living at the home at the same time. (*Id*. at 186). Frew also testified that S.S. and J.S. behaved when she babysat them. (*Id*. at 186-187). On re-direct, Frew testified that, when her mother died, she received less than a $10,000.00 inheritance. (*Id*. at 187-188). Frew testified

that, when Persinger was taking care of their mother, the house was filthy, lots of people were in and out of the home, and there was lots of yelling. (*Id*. at 188).

{¶56} Thereafter, the State rested, and the defense presented its case the next day. (June 15, 2012 Tr. at 4). Persinger testified that she is currently living in a pre-release center and is currently incarcerated for nonpayment of child support involving her two older sons and their grandmother. (*Id*. at 4-5). Persinger testified that she would be released on July 4, 2012. (*Id*. at 5). Persinger identified exhibits one, two, and three as certificates she obtained while incarcerated for Anger Resolution, Positive Parenting, and Stewards of Children Class. (*Id*. at 7). Persinger testified that she learned about controlling her anger, modified grounding, and protecting her children from sexual predators during these courses. (*Id*.).

{¶57} Persinger testified that S.S.'s behavior was beginning to improve, and J.S. was beginning to have problems acting out, so she began parenting classes to address those problems. (*Id*. at 6). Persinger testified that S.S. began having bowel movement incidents in December, after being removed from the home, and S.S. had to be reminded to go to the bathroom. (*Id*. at 8). According to Persinger, S.S. began having trouble with potty training and accidents, particularly at night, after his father went to prison in 2009. (*Id*.). Persinger thought the night-time accidents were due to nightmares since S.S. would scream out in his sleep. (*Id*. at

9). S.S. did not have a close relationship with his father, according to Persinger, though he did have a close relationship with her since she took him everywhere since she could not afford a baby sitter. (*Id*.).

**{¶58}** Persinger testified that she had permission to feed the ducks in the park. (*Id*. at 10). Persinger testified that she would arrive to office visits early since she had an issue with transportation, and her only transportation was provided through welfare and public transportation. (*Id*.). Persinger denied ever holding J.S. down while Bowman used a belt to spank him, and she testified that she scolded Bowman for using a belt on J.S. (*Id*. at 11). Persinger testified that she missed her two counseling sessions with Christensen because she was in jail on the failure to pay child support charge, and she only missed a total of two sessions. (*Id*. at 11-13). Persinger testified that she took S.S. for counseling when he was about three and a half years old, and S.S. was placed on medication for his attention and aggression problems. (*Id*. at 16).

**{¶59}** Persinger testified that she could not have avoided prison for nonpayment of child support, because she was told she would have to pay the entire $30,000.00 she owed, and she could not pay that amount. (*Id*. at 12). She testified that her rent was $450.00 per month, and she paid for a year's worth of rent so she would have a place to live. (*Id*. at 13). She also testified that she was working on an as-needed-basis at Wendy's, and she walked to work since it was

about eight blocks from where she was living. (*Id*. at 13-14). Persinger testified that she will receive social security income for six months upon her release from prison, and that she has a place to live and a job upon her release. (*Id*. at 14). She testified that she had a psychiatric psychological work-up done at prison, and the results were inconclusive. (*Id*. at 15). She testified that she is an epileptic and her last seizure occurred in December 2010 shortly after K.P. was born, but she is now taking medication to control those seizures. (*Id*. at 17). Persinger testified that she had an episode in prison where she thought she saw things moving, similar to the episode that occurred in the car while driving to Dayton, and the prison examination revealed that panic attacks caused these episodes. (*Id*.). According to Persinger, she and her first husband (Phillip) were using drugs during their marriage, which ultimately caused their marriage to terminate. (*Id*. at 18). Persinger testified that she stopped using drugs 12½ years ago. (*Id*.). She further testified that, upon her release, she has a place to live and a possible job through a friend. (*Id*. at 18-19).

{¶60} On cross-examination, Persinger testified that she was married to Phillip Persinger for 18 months and nine days, and they had two children, Phillip and Kyle, ages 14 and 13, respectively. (*Id*. at 19). Persinger testified that her husband treated the children well, though he was a little controlling since he was going off of drugs. (*Id*. at 19-20). She testified that she left Phillip, and she and

the children moved in with her ex-mother-in-law, at which time she transferred custody of her children to her ex-mother-in-law. (*Id*. at 20). Persinger testified that her ex-mother-in-law asked her to leave the home since she was still on drugs, and she left and failed to maintain a relationship with Phillip and Kyle. (*Id*.). She testified that, since she has been imprisoned, she restarted a relationship with the boys. (*Id*. at 20-21). According to Persinger, she and her husband have a joint child support arrearage of $31,140.36, though she could not explain why court documents only showed her as the obligor for this arrearage amount. (*Id*. at 21). When asked why she thought the obligation was a joint obligation, Persinger testified that the court stated the child support obligation was for both her and her husband to pay, and he was sentenced to prison for 18 months for failure to pay the same arrearage amount, while she was incarcerated six months since she was attempting to pay the support arrearage. (*Id*. at 21-22).

{¶61} Persinger testified that, after her first husband Phillip, she began a five-year relationship with Brian Otis S. and had two children with him, S.S. and J.S. (*Id*. at 23). She testified that Brian was a good provider; however, he was physically aggressive toward S.S., yelling at him constantly and hitting S.S. with a belt. (*Id*. at 23-24). Persinger testified that she left Brian because she received reports of Brian's "unusual punishment" of S.S. (*Id*. at 24). She further testified that Brian is currently incarcerated for fleeing and alluding, and, when she left

Brian he threatened to commit suicide. (*Id.* at 24-25). Persinger testified that, upon Brian's release, she would like Brian to have supervised visitation with S.S. and J.S., though she would not support unsupervised visitations, and she has no intention of reconciling with Brian after his release. (*Id.* at 25). Persinger testified that she began a relationship with Ryan, the man who was caught in the bathtub with his girlfriend's young girls, after Brian was incarcerated, though she ended the relationship after her counselor, Brownlee, advised against the relationship. (*Id.* at 25-26, 48-49).

{¶62} Persinger testified that she knew Bowman from childhood, and she moved in with him in December 2010, though she was not aware that he was a sex offender. (*Id.* at 25-27). Persinger testified that she was aware that Bowman was obsessive compulsive, which is why his home was so clean, and she was aware of Bowman using a belt for spankings, though she was not aware that he was taping J.S.'s hands behind his back. (*Id.* at 27, 50). She also testified that she was aware that Bowman would dress up in an Army-like uniform, call himself "Drill Sergeant Charles," carry a play gun, and march S.S. around the property yelling at him as a form of discipline. (*Id.* at 27-28). Persinger testified that she did not really have a relationship with Tony Fraley—that he was more into her than she was into him—and she left Fraley after she learned he had been abusive in his past. (*Id.* at 28-29). Persinger testified that, after Fraley, she began an on-again-

off-again relationship with David Sprinkle, but he never stayed the night with her. (*Id*. at 29).

{¶63} Persinger further testified that her mother passed away in May 2010, and she received a little more than $9,000.00 as an inheritance, which she used all but a little over $1,000.00 of, to pay for a year's worth of rent. (*Id*. at 30). She testified that, after she received the inheritance, she placed Bill Yates, a family friend, in charge of her finances so she would not spend the money unwisely. (*Id*. at 30-31). Persinger testified that her former probation officer, Brandon Deskins, indicated that she could make monthly payments on her child support arrearage, but this option was no longer available when she was in court. (*Id*. at 31). Persinger will get $310.00 per month for six months in social security benefits upon her release, and she would also qualify for food stamps. (*Id*. at 32). She testified that she has two months left of her prepaid rent, and rent is $450.00 per month, not including utilities, which are around $100.00 per month. (*Id*.).

{¶64} Persinger testified that she first started seeing Brownlee after she called Champaign County Children Services (CCCS) because she was having difficulty with S.S. (*Id*. at 33). According to Persinger, CCCS placed her in the Family and Children First Cluster to help provide her basic services, and she met with Brownlee to deal with her depression after Brian was incarcerated. (*Id*. at 33-34). She testified that she has taken medication for epilepsy since 2004, and she

only takes one medication. (*Id*. at 34-35). Persinger testified that she had a "growth spot" on her brain, which was thought to be a tumor, but it has since depreciated. (*Id*. at 35). She also testified that, while she was at Caring Kitchen, she thought she could have been pregnant with Fraley's child even though she was taking birth control and slept with him only once. (*Id*. at 35-36, 47-48). Persinger testified that K.P. was removed when she was seven weeks old, and she had a bond with K.P., though she did not breast feed K.P. (*Id*. at 36). She testified that she was taught during her CAM counseling to hold S.S.'s hands behind his back to stop him from picking up things and being destructive, so she continued this form of discipline with J.S. (*Id*. at 37). Persinger testified that she tried other forms of discipline before spanking J.S. but those forms of discipline did not work. (*Id*.). She testified that she spanked J.S. after each time he put a hole in the wall, which occurred throughout the day. (*Id*.).

{¶65} Concerning her apartment, Persinger testified that she planned to put her bedroom downstairs to give the children separate bedrooms for privacy reasons. (*Id*. at 37-38). Persinger denied giving S.S. special preference over J.S., though she admitted that she had certain toys for S.S. only, and S.S. would take these toys for "alone time," when he could play by himself. (*Id*. at 38-39). Persinger testified that she does not have a driver's license, though she can get it reinstated by retaking a driving exam. (*Id*. at 40-41). She testified that she was

convicted of theft and had 33 passing bad check charges, though she insisted that she paid restitution. (*Id*. at 41). Persinger testified that there are two individuals currently living in her apartment, along with a child under the age of one. (*Id*. at 42-43).

{¶66} Persinger further testified that she gave custody of Phillip and Kyle to her ex-mother-in-law because she was addicted to heroin. (*Id*. at 44). Persinger testified that she still had rights to Phillip and Kyle and could have obtained custody of them after she dealt with her heroin addiction, but she felt the boys were better off with her ex-mother-in-law since she did not have a job. (*Id*. at 45). Persinger testified that she intends to find a full-time job after she is released from prison, and a friend, Geri Adkins, would assist her with day care. (*Id*. at 46-47). Persinger testified that she could pay for day care, food, and medical assistance with governmental assistance. (*Id*. at 47). She testified that, before the DNA testing, she was not sure whether K.P.'s father was Ryan or Bowman, because she was with Ryan just prior to Bowman. (*Id*. at 49). Persinger testified that, after charges were filed against Ryan, Brownlee advised her to end the relationship, so she left Ryan. (*Id*.). Persinger denied taping her children's hands behind their back, and she testified that she was not aware that Bowman was taping their hands. (*Id*. at 49-50). She further testified that she would have stopped Bowman from doing this if she knew it was happening. (*Id*. at 54). According to Persinger,

she noticed J.S. was having some learning delays, so she enrolled him in Help Me Grow, where they conducted an assessment and concluded that J.S. was not verbalizing. (*Id*. at 51-52). Persinger further testified that S.S. began potty training at two years old, and they used pull-up diapers and a special potty for him. (*Id*. at 52-53). She testified that when S.S. would have accidents, she would clean it up and tell S.S. not to be upset, but he needs to try harder. (*Id*. at 53). She would reward S.S. with toys if he went to the bathroom properly, and she would withhold toys when he did not use the bathroom. (*Id*.). Persinger testified that S.S. enjoyed playing with his toys alone, without J.S. constantly bothering him, so she would allow S.S. to take his toys and play in her bedroom with the door closed. (*Id*. at 54). Persinger testified that she was not aware that Bowman was a registered sex offender until she received notification from LCCS, and she was planning on leaving Bowman anyway since she found out that he was taping J.S.'s hands. (*Id*. at 55). Persinger testified that she tried time-outs with S.S., but he would pound his head against the wall. (*Id*. at 56).

{¶67} Persinger testified that Gary, a 60-year-old man who was her babysitter growing up, would watch J.S. occasionally. (*Id*.). According to Persinger, Gary was no longer working and lived with his brother, Ronnie, and she was not aware that Gary was using a fly swatter to discipline J.S. (*Id*. at 56-57). Persinger testified that she would send J.S. to Gary when she had to take S.S. to

appointments and when Bowman was angry with J.S. for misbehaving. (*Id.* at 57). Persinger did not find it odd that she sent J.S. to Gary when he was misbehaving, and she further testified that she could live without a man and had no intention of starting a relationship upon her release from imprisonment. (*Id.* at 58). She testified that she thought S.S. was showing signs of improved behavior prior to moving in with Bowman, and she sought help after that with S.S. because he was displaying anger. (*Id.* at 60-61). Persinger testified that, when S.S. was five years old, they could not restrain him from fighting and kicking, so they called the police, and the police recommended that she take S.S. to the hospital for psychiatric care. (*Id.* at 61). Persinger testified that she now believes that S.S. was acting out after they moved in with Bowman, because Bowman was abusing the children, and she should have recognized that issue. (*Id.* at 62). Persinger testified that she has to pay off her entire child support arrearage to get her driver's license returned. (*Id.* at 63). She testified that she is currently taking birth control, has no plans on having any more children, and her church family will help her with the children. (*Id.* at 64). Persinger testified that she can support her children; and if not, she would ask her church family or others for help. (*Id.* at 65).

{¶68} David Sprinkle testified that he has known Persinger for 12-13 years, and she has babysat his two children. (*Id.* at 67-68). According to Sprinkle, Persinger interacted very well with his children, and she interacts very well with

her own children. (*Id*. at 68). On cross-examination, Sprinkle testified that Persinger watched his children for a couple hours at a time, and he has never left his children with her for an extended period of time. (*Id*. at 69). He further testified that he attempts, first, to discipline his children using a time-out, though he has spanked his children on their buttocks through their pants with his bare hand if they misbehaved seriously. (*Id*. at 69-70). Sprinkle testified that he did not think it was appropriate to spank a two or three-year-old without their pants using a belt. (*Id*. at 70). He also testified that he did not think taping a three-year-old child's hands behind their back was a proper form of discipline, nor was it appropriate to send your children away when you cannot handle their misbehavior. (*Id*.). Sprinkle testified that he intended to rekindle his relationship with Persinger after she is released from prison. (*Id*. at 71). He testified that he currently lives with his step-dad and mom to help with their medical needs, and he has a job and helps with the rent. (*Id*.). Sprinkle explained that he did not want to live with Persinger since his kids were still young and he is still in the process of a divorce. (*Id*.). He testified that he has been separated from the mother of his children for five years, and she has no contact with the children. (*Id*. at 71-72).

{¶69} After reviewing the evidence presented, the trial court determined that granting LCCS' motion for permanent custody was in the minor children's best interest. (July 16, 2012 JE, Doc. No. 156). The trial court found that

Persinger, while genuinely loving her children, was unable to provide for them financially and emotionally. (*Id*.). The trial court further found that, by failing to make any payment toward her child support arrearage, Persinger made it impossible for her to complete the case plan goals. (*Id*.). The trial court found Dr. Feltz's report insightful, particularly his finding that Persinger was unable to provide an emotionally nurturing environment for her children and unconsciously placed her need for male companionship above her children's safety. (*Id*.). The trial court noted that Persinger has, in fact, surrounded her children with dangerous men, including a registered sex offender (Bowman), a man who was charged with sexual offenses involving his girlfriend's minor children (Ryan), and physically abusive men (Brian Otis S. and Bowman). (*Id*.). The trial court also found that Persinger's corporal punishment was "clearly cruel and excessive under the circumstances," and Persinger did not recognize her need to calm down before punishing her minor children. (*Id*.). The trial court noted the vast improvement the children have made while in the foster home, and the GAL's "passionate summary" of her concerns should the court deny the motion. (*Id*.). Finally, the trial court found that, notwithstanding her expressed desire to change, Persinger's actions have shown an inability to change, and the children need a legally secure and permanent placement. (*Id*.).

{¶70} Persinger first argues that the trial court erred by granting LCCS permanent custody because she completed her case plan. The record here demonstrates otherwise. For example, Persinger was required to seek, obtain, *and maintain* employment to meet the children's basic needs. (Doc. No. 21). While Persinger did obtain a PRN job at Wendy's working around ten hours per week, this limited employment would not be sufficient to support her three children. Regardless, Persinger lost this job due to her incarceration for failing to pay her child support arrearage. Instead of making *any* payment toward her child support arrearage with her inheritance, Persinger chose to pay an entire year's worth of rent on her apartment—an apartment that would sit vacant if she was incarcerated. This unreasonable decision resulted in her imprisonment, loss of employment, her inability to complete case plan goals, and her inability to exercise visitation.

{¶71} Persinger's scheduled release date was July 4, 2012, though she *speculated* that she would be granted judicial release. (June 15, 2012 Tr. at 5). It is also unclear how Persinger will continue to avoid further incarceration for failing to pay her child support obligation. R.C. 2151.414(E)(13). While Persinger insists she can support her children upon her release, her past actions have demonstrated otherwise. While Persinger testified that a friend *might* provide her employment upon her release, Persinger offered no details concerning this employment and made it clear that she intends to support her children by using

public assistance and the good charity of other people. This behavior is consistent with Dr. Feltz's diagnosis of dependency. While the record is replete with Persinger's good intentions and well-meaning promises, her children deserve more than mere intentions and promises. Persinger has an extended history of failing to implement the necessary changes for her children's sake when given the chance. The children's need for a legally secure and permanent placement is not achieved by mere promises and good intentions alone.

{¶72} Closely tied to the case plan goal of employment, a second case plan goal required Persinger to seek, obtain, and maintain stable housing. (Doc. No. 21). After LCCS became involved, Bowman evicted Persinger from his home, requiring her to live in a shelter. Near the end of July 2011, Persinger obtained an apartment; however, Persinger's subsequent incarceration and lack of employment raised serious concern over her ability to maintain housing after her release since the lease and prepaid rent ended prior to her release date. (Doc. No. 88). It was unclear how Persinger intended to maintain her apartment after her public assistance ended, besides her testimony that she *might* have a job with a friend.

{¶73} Aside from failing to complete her case plan goals, the record clearly and convincingly demonstrated that the children should not be placed with Persinger. Persinger suffers from a "chronic emotional illness" affecting her ability to recognize and empathize with the needs of her children. R.C.

2151.414(E)(2). Persinger is unable to set aside her own need for male companionship even when those male companions cause her children to suffer physically, emotionally, and sexually. R.C. 2151.414(E)(14). Persinger's first husband, Phillip, was a drug addict, verbally and physically abusive, controlling, and is currently imprisoned. After that, Persinger began a relationship with Brian Otis S., the father of S.S. and J.S., who was verbally and physically abusive toward S.S., had suicidal ideations, and is also currently incarcerated. Persinger then began a relationship with Ryan, a man who was charged with a sexual offense involving his girlfriend's minor girls. Then, Persinger moved in with and had a child with Bowman, who was a registered sex offender, and was physically and possibly even sexually abusive toward J.S. Then, after LCCS initiated its case and Persinger was living in a shelter, she began a relationship with Fraely, who also resided at the shelter and who was mentally unstable. Not only did Persinger fail to recognize the danger these men posed in the abstract but actually failed to protect her children from verbal, physical, and even sexual abuse, when these things occurred. It is significant that Persinger continued to pursue relationships with dangerous men even after LCCS became involved.

{¶74} Besides her dangerous male companions, Persinger allowed Gary Stapleton, a low functioning male neighbor who threatened physical violence upon the children, to watch J.S. several times. There was also testimony that Persinger

was going to allow a friend to move into her apartment, even though this friend had a boyfriend who was stalking her. Persinger failed to recognize the danger this might pose to her children. She also failed to recognize the danger of moving her bedroom to the first floor of her residence, while placing her toddler and infant in second floor bedrooms where they could have fallen from the stairs. Persinger was also oblivious to the possible danger to K.P. when she provided toxic paint for a visitation activity. While the record does not support a finding that Persinger purposely placed her children in danger, she does not seem to appreciate that dangerous situations often resulted from her negligent decision-making.

{¶75} The GAL also raised serious concerns about Persinger should the trial court not grant LCCS permanent custody. While recognizing that Persinger loved her children, the GAL testified that Persinger was simply unable to meet the children's most basic needs, and Persinger was unwilling to sacrifice her need for male companionship even for her children's safety. The evidence also showed that S.S. and J.S. improved dramatically with the Frosts but would quickly regress after visiting Persinger.

{¶76} Persinger argues that LCCS should have waited for her to obtain judicial release so she could continue her case plan. We disagree. LCCS provided Persinger with ample opportunity to complete her case plan. LCCS provided Persinger with transportation assistance, social services, counseling, and in-home

parental coaching, to name a few. The testimony demonstrated that Persinger *talked* about changing but failed to actually implement the required changes. Besides that, Persinger would not have made the necessary changes even if she was granted additional time. According to Dr. Feltz, Persinger's personality caused her to reject social rules for her own set of rules and to require the companionship of others. Persinger's attention-seeking behaviors after LCCS' involvement demonstrate that she is unable to change for her children's sake.

{¶77} Although none of the concerns in this case alone may have warranted granting LCCS permanent custody of S.S., J.S., and K.P., granting LCCS' motion was in the minor children's best interest when viewed in light of all the circumstances. Upon review of the record, we therefore conclude that the trial court's findings were supported by clear and convincing evidence, and the trial court did not err by granting LCCS' motion for permanent custody.

{¶78} Persinger's assignment of error is overruled.

{¶79} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**